James S. Thomson, II; ISB #6124
Aaron G. Eskue; ISB #11958
POWERS FARLEY, PC
702 West Idaho Street, Suite 700
Boise, Idaho  83702
Telephone: (208) 577-5100
Email: contact@powersfarley.com
        jst@powersfarley.com
        age@powersfarley.com

Attorneys for Defendant Millennium Networks, LLC
d/b/a Silver Star Communications

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| PEDRO MANUEL ALCANTAR, Deceased, and survived by his wife, DULCE MARIA GONZALEZ, MARTA MEJIA VELASQUEZ, RICARDO ALCANTAR SANDOVAL; LUIS ENRIQUE SERENO, Deceased, and survived by his wife, SANDRA RUBIO MARTINEZ, individually and on behalf of her minor son LS, and daughter, MS; JOSE GUADALUPE SANCHEZ, Deceased, and survived by MARIA MEDINA, LUCIANO SANCHEZ, LUCIANO SANCHEZ MEDINA; JAVIER GOMER ALCANTAR, Deceased, and survived by his wife, CAROLINA REBOLLO, and on behalf of her minor son, EG, and daughter, SG; BRANDON PONCE, Deceased, and survived by FANNY ANDREA PONCE, CHRISTIAN PONCE, ARTURO PONCE; ABEL MEJIA, Deceased, and survived by his wife, JASMINE MOLINA, individually and on behalf of her minor daughter HM, daughter KM; RICARDO ALCANTAR MEJIA; JOSE ALCANTAR MEJIA,<br><br>                              Plaintiffs,<br><br>v.<br><br>LUIS GARCIA DIAZ, Individually, ADRIAN SIRBU, Individually; TOWER COMMUNICATIONS SOLUTIONS, LLC; J&A DRILLING AND CONSTRUCTION, LLC, MILLENIUM NETWORKS, LLC d/b/a | Case No. 4:24-CV-00479<br><br>**DEFENDANT MILLENNIUM NETWORKS, LLC'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT [DKT. 77]** |

SILVER STAR COMMUNICATIONS,
WESTERN MOUNTAIN, INC., GOLD
COMMUNICATIONS EXPERT INC., and
SIGNET
CONSTRUCTION, LLC,

               Defendants.

COMES NOW Defendant Millennium Networks, LLC d/b/a Silver Star Communications, by and through its counsel of record, Powers Farley, PC and hereby respectfully moves this Court for leave to file a supplemental memorandum and declaration in support of its Motion for Summary Judgment pursuant to Local Civil Rule 7.1(d)(1).

Silver Star requests leave to file a supplemental supporting memorandum and declaration of counsel to its pending Motion for Summary Judgment because new and additional evidence has come to light after the parties' briefing for the motion was completed. Briefing for Silver Star's Motion for Summary Judgment was completed on January 21, 2026, upon Silver Star filing its Reply in Support of Defendant Millennium Networks, LLC's Motion for Summary Judgment [Dkt. 87]. After briefing had been completed, the parties scheduled and resumed the deposition of Defendant Luis Garcia Diaz on February 12, 2026. Mr. Garcia Diaz was initially deposed on February 18, 2025, which, like most of the other appearing defendants, occurred before Silver Star became a party to this lawsuit. [*See* Dkt. 77-3, p. 127, Transcript of the Deposition of Luis Garcia Diaz, dated February 18, 2025, Ex. C, Declaration of Aaron G. Eskue in Support of Millennium Networks, LLC's Motion for Summary Judgment [Dkt. 77-2].] As such, Silver Star and other defendants had an opportunity to question Mr. Garcia Diaz at his February 12, 2026 deposition, where previously they had not.

Silver Star believes the recent testimony from Mr. Garcia Diaz provides important evidence material to the arguments and bases it had offered in support of its motion. This evidence was not in existence when Silver Star filed its dispositive motion in December 2025; nor is the new

testimonial evidence sought to be offered unreasonably cumulative, duplicative, or redundant. In short, Silver Star's purpose for filing its supplemental memorandum is to provide the Court with a more complete record of evidence and argument for its consideration of Silver Star's pending Motion for Summary Judgment.

Based on the foregoing, Silver Star requests the Court grant its motion for leave to file a supplemental memorandum in support of its pending Motion for Summary Judgment. Attached hereto is a copy of Silver Star's proposed Supplemental Memorandum in Support of Defendant Millennium Networks, LLC's Motion for Summary Judgment [Dkt. 77] and the Supplemental Declaration of Aaron G. Eskue in Support of Defendant Millennium Networks, LLC's Motion for Summary Judgment [Dkt. 77], with Exhibit A (deposition transcript of the February 12, 2026, deposition of Luis Garcia Diaz) for the Court's consideration of Silver Star's instant motion.

DATED this 24th day of March, 2026.

POWERS FARLEY, PC

By   /s/ Aaron G. Eskue
    James S. Thomson, II – Of the Firm
    Aaron G. Eskue – Of the Firm
    Attorneys for Defendant Millennium Networks,
    LLC d/b/a Silver Star Communications

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 24th day of March, 2026, the foregoing document was electronically filed with the U.S. District Court. Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court CM/ECF System:

Enrique G. Serna
Attorneys for Plaintiffs
enrique@serna-associates.com

Bruce R. McAllister
Cody J. Morgan
Attorneys for Defendant Signet Construction, LLC
bmcallister@ajhlaw.com
cmorgan@ajhlaw.com

Bren E. Mollerup
Attorneys for Defendant Western Mountain, Inc.
mollerup@benoitlaw.com

Brady Hall
Attorneys for Defendant Gold Communications Expert, Inc.
brady@bhlawidaho.com


                                        /s/ Aaron G. Eskue
                                        James S. Thomson, II
                                        Aaron G. Eskue

James S. Thomson, II; ISB #6124
Aaron G. Eskue; ISB #11958
POWERS FARLEY, PC
702 West Idaho Street, Suite 700
Boise, Idaho 83702
Telephone: (208) 577-5100
Email: contact@powersfarley.com
        jst@powersfarley.com
        age@powersfarley.com

Attorneys for Defendant Millennium Networks, LLC
d/b/a Silver Star Communications

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| PEDRO MANUEL ALCANTAR, Deceased, and survived by his wife, DULCE MARIA GONZALEZ, MARTA MEJIA VELASQUEZ, RICARDO ALCANTAR SANDOVAL; LUIS ENRIQUE SERENO, Deceased, and survived by his wife, SANDRA RUBIO MARTINEZ, individually and on behalf of her minor son LS, and daughter, MS; JOSE GUADALUPE SANCHEZ, Deceased, and survived by MARIA MEDINA, LUCIANO SANCHEZ, LUCIANO SANCHEZ MEDINA; JAVIER GOMER ALCANTAR, Deceased, and survived by his wife, CAROLINA REBOLLO, and on behalf of her minor son, EG, and daughter, SG; BRANDON PONCE, Deceased, and survived by FANNY ANDREA PONCE, CHRISTIAN PONCE, ARTURO PONCE; ABEL MEJIA, Deceased, and survived by his wife, JASMINE MOLINA, individually and on behalf of her minor daughter HM, daughter KM; RICARDO ALCANTAR MEJIA; JOSE ALCANTAR MEJIA, <br><br>                         Plaintiffs, <br><br> v. <br><br> LUIS GARCIA DIAZ, Individually, ADRIAN SIRBU, Individually; TOWER COMMUNICATIONS SOLUTIONS, LLC; J&A DRILLING AND CONSTRUCTION, LLC, MILLENIUM NETWORKS, LLC d/b/a | Case No. 4:24-CV-00479 <br><br> **SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANT MILLENNIUM NETWORKS, LLC'S MOTION FOR SUMMARY JUDGMENT [DKT. 77]** |

SILVER STAR COMMUNICATIONS,
WESTERN MOUNTAIN, INC., GOLD
COMMUNICATIONS EXPERT INC., and
SIGNET
CONSTRUCTION, LLC,

                Defendants.

COMES NOW Defendant Millennium Networks, LLC d/b/a Silver Star Communications, by and through its counsel of record, Powers Farley, PC and hereby submits this Supplemental Memorandum in Support of Defendant Millennium Networks, LLC's Motion for Summary Judgment.

## I.     **ARGUMENT**

Silver Star supplements its motion based on new evidence recently developed in this matter which bears on Plaintiffs' argument that Mr. Garcia Diaz was acting within the course and scope of his employment at the time of the Accident and that Silver Star exercised the degree of control over its contractor (Western Mountain) and its subcontractors, including Garcia Diaz required to subject it to liability for the Accident. With a complete record and supplemental argument now before the Court, Silver Star requests the Court grant its Motion for Summary Judgment.

A.    **MR. GARCIA DIAZ'S RECENT TESTIMONY SHOWS HE WAS NOT IN THE COURSE AND SCOPE OF ANY EMPLOYMENT AT THE TIME OF THE ACCIDENT.**

"[W]hat is required to defeat summary judgment is simply evidence such that a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Zetwick v. Cnty. Of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (internal quotation marks omitted). "[T]he Supreme Court has made clear: 'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial,' and summary judgment is appropriate." *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009));

*Fragnella v. Petrovich*, 153 Idaho 266, 272, 281 P.3d 103, 109 (2012) ("in order to withstand summary judgment, the plaintiff must present sufficient evidence upon which a jury could rely."). Therefore, "[a]s a rule, in order to raise a fact issue for trial, the non-moving party must present more than a 'mere scintilla of evidence' to defeat a motion for summary judgment." *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1068 (9th Cir. 2011).

"It is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179 (9th Cir. 1988).

In light of the whole record now before the Court, it is clear that Plaintiffs rely on insufficient and inadmissible evidence in an effort to defeat summary judgment. Specifically, Plaintiffs relied and continue to rely exclusively on the testimony of Mr. Garcia Diaz to support their argument that he was acting within the course and scope of his employment at the time of the Accident. [Plaintiffs' Statements of Undisputed and Disputed Facts in Opposition to Millenium's [sic] Motion for Summary Judgment ("Pl. SOF") (Dkt. 83-2), pp. 1-3, 8-10 ¶¶ (1)(a), (c), (2)(a)-(c); *see* Plaintiffs' Memorandum in Support of Opposition to Defendant Millennium Networks, LLC's Motion for Summary Judgment ("Opposition") (Dkt. 83-3), p. 16.] Even after Mr. Garcia Diaz's most recent testimony, Plaintiffs have not faltered from such reliance. Yet in so relying, Plaintiffs consciously disregard Mr. Garcia Diaz's patent lack of personal knowledge of his own activities leading up to the Accident. This is not evidence on which a reasonable jury can return a verdict in Plaintiffs' favor against Silver Star.

In his most recent deposition, Mr. Garcia Diaz testified that he recalled traveling the morning of the Accident to allegedly pick up a dirt compactor. [Deposition of Luis Garcia Diaz (Volume II) ("Garcia Diaz Depo., Vol. II"), p. 103, ll. 22-25, Ex. A, Supplemental Declaration of Aaron G. Eskue in Support of Millennium Networks, LLC's Motion for Summary Judgment

SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANT MILLENNIUM NETWORKS, LLC'S MOTION FOR SUMMARY JUDGMENT [DKT. 77] – 3

("Eskue Supp. Dec.").] But yet his last memory before the Accident was leaving his Airbnb: "I just remember having left the house. I don't remember very much." [Garcia Diaz Depo., Vol. II, 105:20-23, Ex. A, Eskue Supp. Dec.] In fact, every aspect of his travel and presence in Idaho Falls is left to question:

> Q. And let me clarify something. Had you – at the time that the accident occurred, had you already picked up this compactor or were you on your way to pick up the compactor.
> A. Well, it seems that I had already picked it up, because I saw the pictures of my accident in my [criminal] discovery and the compactor was there laying on the ground.
> [...]
> Q. What part of town did you pick up the compactor in Idaho Falls on the day of the accident.
> A. I don't know. I don't know the place. I don't know the area. I – my memory is not good. I can't remember where I went or where I picked it up. I just remember seeing pictures and seeing that the compactor was on the ground. It went flying and fell on the ground.
> Q. Do you have any recollection as you sit here today of actually picking up the compactor in Idaho Falls?
> A. I don't remember.

[Garcia Diaz Depo., Vol. II, 104:1-7, 106:13-24, Ex. A, Eskue Supp. Dec. (emphasis added).]

While Mr. Garcia Diaz could infer from accident scene photographs that he must have already picked up the compactor before the Accident, the foundation for his knowledge surrounding the compactor is notoriously absent:

> Q. Did [J&A Drilling Owner] Jaime tell you to go to Idaho Falls to pick up a compactor on the morning of the accident?
> A. Nobody told me to go. I knew what I needed to – what I needed to do my work.
> Q. How did you know the compactor was in Idaho Falls?
> A. I don't remember.
> Q. Do you remember going to any other locations in Idaho Falls other than what you believe to pick up the compactor?
> A. I already told you that I don't know this town. I have only driven by this town. I have never been to this town.
> Q. Where were you going at the time of the accident?
> A. I suppose I was going home.
> Q. It's your testimony, then, that at the time of the accident, you were headed home; is that correct?

SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANT MILLENNIUM NETWORKS, LLC'S MOTION FOR SUMMARY JUDGMENT [DKT. 77] – 4

A. <u>I don't know where I was headed.</u>

[...]

**Q. Do you remember why you were going to get the compactor?**

A. I don't remember.

**Q. Do you remember if anyone asked you to go get the compactor?**

A. I don't remember.

**Q. Do you remember where you were going to get the compactor?**

A. I suppose home.

**Q. You were going home to get the compactor?**

A. Oh, no. I don't remember where I was going to pick it up.

**Q. Do you remember who even owned the compactor?**

A. I don't remember.

**Q. Do you remember what caused you to wake up so early on a Saturday morning to go get a compactor?**

A. <u>I would imagine that I needed it, but I don't remember.</u>

**Q. And your intent was just to bring it back home to the Airbnb?**

A. <u>I think so or to have it in the truck available for work.</u>

[Garcia Diaz Depo., Vol. II, 109:7-25, 129:3-21, Ex. A, Eskue Supp. Dec. (emphasis added).] Mr. Garcia Diaz testified to never having been to Idaho Falls to pick up tools before the date of the Accident, let alone the fact that Gacia Diaz could not even remember if he was going to work that morning [Garcia Diaz Depo., Vol. II, 107:8-17, 108:4-14, 112:12-18, Ex. A, Eskue Supp. Dec.]

First, Plaintiffs have and can only continue to offer, at most, a scintilla of admissible evidence that Mr. Garcia Diaz was allegedly acting within the course and scope of employment when the Accident occurred. The only evidence that can be remotely construed as sufficient to support an inference that Mr. Garcia Diaz was acting within the course and scope of employment was that he only drove the Dodge Ram for work and traveled to Idaho Falls to pick up a dirt compactor. [Garcia Diaz Depo., Vol. II, 76:12-18, 77:1-9, Ex. A, Eskue Dec.] But this is not enough. "[I]f the employee's purpose is purely personal, it does not matter that the employee is using the employer's tools or driving the employer's vehicle or some other activity that merely resembles his or her employment. **The employee must be engaged in some type of work that is assigned to him or her in the general sense of doing something to serve the employer**." *Richard J. & Esther E. Wooley Tr. v. DeBest Plumbing, Inc.*, 133 Idaho 180, 983 P.2d 834 (1999) (emphasis

SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANT MILLENNIUM NETWORKS, LLC'S
MOTION FOR SUMMARY JUDGMENT [DKT. 77] – 5

added). Moreover, simply traveling to or from something that may be work related, under Idaho law, does not *ipso facto* place an employee within the course and scope of employment. *See Teurlings v. Larson*, 156 Idaho 65, 74, 320 P.3d 1224, 1233 (2014); *Finholt v. Cresto*, 143 Idaho 894, 898, 155 P.3d 695, 699 (2007).[1] The Idaho Supreme Court has refused "to extend the coming and going rule and its exceptions to the law of respondeat superior." *Teurlings*, 156 Idaho at 74, 320 P.3d at 1233.

Here, the sole evidence Plaintiffs can point to in support of their theory is that Mr. Garcia Diaz was operating a work vehicle and that he testified he was in Idaho Falls to get a dirt compactor. Regarding the latter, the above testimony respecting Garcia Diaz's memory is, admittedly, suspect at best. On the other hand, substantial evidence supports the contrary position that Mr. Garcia Diaz was not acting within the course and scope of any employment when the Accident happened. No one directed Garcia Diaz to go to Idaho Falls to get a dirt compactor, nor can he recall whether he was even going to work after getting it. Critically, Mr. Garcia Diaz believes he was headed home. Never mind the fact that Mr. Garcia Diaz contradicts his initial testimony that his original basis for travel prior to the Accident was to clear dirt from a Rexburg resident's yard. [Garcia Diaz Depo., Vol. I, 50:5-17, Ex. B. (Dkt. 77-3), Eskue Dec. (Dkt., 77-2).[2]] This was Mr. Garcia Diaz's personal choice, done for personal purposes, covered by an extremely

---

[1] In *Finholt*, the Idaho Supreme Court explained that, "Cases in Idaho have articulated the coming and going rule, which states that an employee is not within the course and scope of his employment on his way to and from work. Typically these cases have arisen in the worker's compensation area rather than in the context of a civil action." 143 Idaho at 898, 155 P.3d at 699 (internal quotations and citation omitted). The court proceeded to discuss two exceptions to the coming and going rule: the "special errand" exception and "traveling employee" exception. As to the former, the court explained that "the special errand exception is premised on the idea that an employee leaving his normal place of work to perform a special job for an employer is, nevertheless, still performing part of his normal job." *Id.* The latter exception is recognized "[w]hen an employee's work requires him to travel away from the employer's place of business or his normal place of work, the employee [will be] covered by worker's compensation." *Id.*

[2] The transcript for the deposition of Luis Garcia Diaz, taken February 18, 2025, will be referred to as "Vol. I" and was previously filed with the Court at Dkt. 77-3 (Exhibit B) with the Declaration of Aaron G. Eskue in Support of Defendant Millennium Network, LLC's Motion for Summary Judgment [77-2], previously filed together on December 5, 2025.

SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANT MILLENNIUM NETWORKS, LLC'S MOTION FOR SUMMARY JUDGMENT [DKT. 77] – 6

thin veneer of "work." As such, there is simply insufficient evidence for a reasonable inference to be drawn that Mr. Garcia Diaz was within the course and scope of his employment at the time of the Accident. Without more, Plaintiffs cannot defeat summary judgment.

Second, the only evidence Plaintiffs have and can offer that Mr. Garcia Diaz was purportedly working is Garcia Diaz's testimony based on his own questionable memory. The above testimony makes abundantly clear that Gracia Diaz's "memory" of why he was in Idaho Falls before the Accident is nothing more than inadmissible speculation. Under Rule 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. "Evidence to prove personal knowledge may consist of the witness's own testimony." *Id.* "Rule 602 requires any witness to have sufficient memory of the events such that she is not forced to 'fill the gaps in her memory with hearsay or speculation.'" *United States v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015) (quoting 27 Charles Alan Wright, *et al.*, Federal Practice & Procedure Evidence § 6023 (2d ed.2007) (cleaned up)). Witnesses are not "permitted to speculate, guess, or voice suspicions." *Id.* (quotation marks omitted).

Here, Mr. Garcia Diaz's testimony regarding whether he was working is inadmissible for lack of foundation. Mr. Garcia Diaz cannot remember where he was going or what he was doing prior to the Accident other than a belief that he was getting a dirt compactor. The only source of evidence Garcia Diaz offers is a loose inference that a compactor was visible in pictures from the accident scene to corroborate his account that he picked up the compactor *before* the Accident. But even with that evidentiary inference, he lacks foundational knowledge sufficient to testify that he was indeed working as part of his employment when the Accident occurred. *See* Fed. R. Evid. 602 ("A witness may testify to a matter **only if evidence is introduced** sufficient to support a finding that the witness has personal knowledge of the matter." (emphasis added)). In fact, contrary

to Plaintiffs' position, Mr. Garcia Diaz testified that had been going home when the Accident occurred. But even construing Garcia Diaz's testimony in favor of Plaintiffs, Garcia Diaz testifies that he does not remember what he was doing prior to the Accident, leaving only speculation. Accordingly, Mr. Garcia Diaz's most recent deposition testimony indisputably shows that he lacks personal knowledge of whether he was traveling to work and working on the Project at the time of the Accident. There is no other evidence in the record supporting directly or inferentially that Mr. Garcia Diaz was acting within the course and scope of his employment. The Court must disregard such inadmissible testimony as a matter of law.

**B.** **RECENTLY DEVELOPED EVIDENCE DEMONSTRATES SILVER STAR DID NOT EXERCISE CONTROL OVER GARCIA DIAZ NECESSARY FOR LIABILITY TO ATTACH.**

Based on recent discovery, evidence further supports Silver Star's grounds for summary judgment. Specifically, Silver Star did not exercise the type of control over Mr. Garcia Diaz's work on the Project that would negate the general rule that a contractor is not liable for the torts of its independent contractors or their servants. *Gneiting v. Idaho Asphalt Supply, Inc.*, 130 Idaho 393, 394, 941 P.2d 932, 934 (Ct. App. 1997); *Ek v. Herrington*, 939 F.2d 839, 841 (9th Cir. 1991). There is simply no evidence that Silver Star exercised the requisite control over Mr. Garcia Diaz while working on the Project to subject Silver Star to liability for the Accident. Mr. Garcia Diaz testified that he did not know who Silver Star was prior his most recent deposition. [Garcia Diaz Depo., Vol. II, 131:7-12, Ex. A, Eskue Supp. Dec.] Silver Star never directed Garcia Diaz what to do nor provided work maps directly to Mr. Garcia Diaz; rather, Garcia Diaz was provided the work maps by Gold and then would proceed to perform that work. [Garcia Diaz Depo., Vol. II, 136:3-21, 118:20-25, Ex. A, Eskue Supp. Dec.] Garcia Diaz further testified that he "did not pick up tools" from Silver Star's warehouse, only conduit and fiber vaults. [Garcia Diaz Depo., Vol. II, 144:5-10, Ex. A, Eskue Supp.] This last point of testimony cannot be underscored enough—

assuming the Court does consider Garcia Diaz's testimony and construes it in Plaintiffs' favor—given Mr. Garcia Diaz traveled to Idaho Falls for a *tool* (dirt compactor) and not materials at Silver Star's warehouse in Thorton. Mr. Garcia Diaz's activities on the morning of the Accident did not involve Silver Star nor were they carried out with the intent to benefit Silver Star.

Not only that, but Plaintiffs have offered zero evidence or authority to support why Silver Star had a right to control or should have controlled Mr. Garcia Diaz's activities outside of the Project. Particularly, Plaintiffs have failed to identify facts that Mr. Garcia Diaz had consumed alcohol or been intoxicated while working on the Project, which Garcia Diaz has denied. [Garcia Diaz Depo., Vol. II, 129:1, 130:1-19, Ex. A, Eskue Supp. Dec.] Nonetheless, Plaintiffs assert Silver Star (and the other appearing Defendants associated with the Project) can be and should be held responsible for the activities Mr. Garcia Diaz engaged in outside of the Project's working hours. But that is not the law in Idaho. *See Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 400, 987 P.2d 300, 312 (1999) ("declin[ing] to hold that Idaho universities have the kind of a special relationship creating a duty to aid or protect adult students from the risks associated with the students' own voluntary intoxication[,]" recognizing that Idaho universities were "not ... insurer[s] of the safety of [their] students."). Silver Star is not the insurer of a remote subcontractor's employee, let alone that employee's activities engaged in outside of work.

Nor did Silver Star own or control the Dodge Ram operated by Mr. Garcia Diaz at the time of the Accident. [*See* Vehicle Lease Agreement, Exhibit D (Dkt. 91-7), filed on January 30, 2026.] Although Plaintiffs appear to suggest that Silver Star, as the owner of the Project, had plenary authority to control the Project, they offer nothing to evidence Silver Star's authority to control the Dodge Ram operated by Garcia Diaz. As such, any act or omission with respect to Garcia Diaz's use of the Dodge Ram cannot be attributed to Silver Star as a matter of law. *See Lopez v. Langer*, 114 Idaho 873, 875, 761 P.2d 1225, 1227 (1988) ("[T]he paramount requirement for liability under

a theory of negligent entrustment is whether or not the defendant had a right to control the vehicle.")

In sum, the supplemented record before the Court further establishes that, as a matter of law, Silver Star did not exercise the degree of control necessary to subject it to liability for Mr. Garcia Diaz's conduct relative to the Accident.

## II.    CONCLUSION

Defendant Millennium Networks, LLC respectfully requests the Court grant its Motion for Summary Judgment and dismiss Plaintiffs' claims against it with prejudice as a matter of law.

DATED this 24th day of March, 2026.

POWERS FARLEY, PC


By    /s/ Aaron G. Eskue
    James S. Thomson, II – Of the Firm
    Aaron G. Eskue – Of the Firm
    Attorneys for Defendant Millennium Networks,
    LLC d/b/a Silver Star Communications

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 24th day of March, 2026, the foregoing document was electronically filed with the U.S. District Court. Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court CM/ECF System:

Enrique G. Serna
Attorneys for Plaintiffs
enrique@serna-associates.com

Bruce R. McAllister
Cody J. Morgan
Attorneys for Defendant Signet Construction, LLC
bmcallister@ajhlaw.com
cmorgan@ajhlaw.com

Bren E. Mollerup
Attorneys for Defendant Western Mountain, Inc.
mollerup@benoitlaw.com

Brady Hall
Attorneys for Defendant Gold Communications Expert, Inc.
brady@bhlawidaho.com


/s/ Aaron G. Eskue
James S. Thomson, II
Aaron G. Eskue

James S. Thomson, II; ISB #6124
Aaron G. Eskue; ISB #11958
POWERS FARLEY, PC
702 West Idaho Street, Suite 700
Boise, Idaho  83702
Telephone: (208) 577-5100
Email: contact@powersfarley.com
        jst@powersfarley.com
        age@powersfarley.com

Attorneys for Defendant Millennium Networks, LLC
d/b/a Silver Star Communications

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| PEDRO MANUEL ALCANTAR, Deceased, and survived by his wife, DULCE MARIA GONZALEZ, MARTA MEJIA VELASQUEZ, RICARDO ALCANTAR SANDOVAL; LUIS ENRIQUE SERENO, Deceased, and survived by his wife, SANDRA RUBIO MARTINEZ, individually and on behalf of her minor son LS, and daughter, MS; JOSE GUADALUPE SANCHEZ, Deceased, and sutvived by MARIA MEDINA, LUCIANO SANCHEZ, LUCIANO SANCHEZ MEDINA; JAVIER GOMER ALCANTAR, Deceased, and survived by his wife, CAROLINA REBOLLO, and on behalf ofher minor son, EG, and daughter, SG; BRANDON PONCE, Deceased, and survived by FANNY ANDREA PONCE, CHRISTIAN PONCE, ARTURO PONCE; ABEL MEJIA, Deceased, and survived by his wife, JASMINE MOLINA, individually and on behalf of her minor daughter HM, daughter KM; RICARDO ALCANTAR MEJIA; JOSE ALCANTAR MEJIA, | Case No. 4:24-CV-00479  **SUPPLEMENTAL DECLARATION OF AARON G. ESKUE IN SUPPORT OF DEFENDANT MILLENNIUM NETWORKS, LLC'S MOTION FOR SUMMARY JUDGMENT [DKT. 77]** |
| Plaintiffs, | |
| v. | |
| LUIS GARCIA DIAZ, Individually, ADRIAN SIRBU, Individually; TOWER COMMUNICATIONS SOLUTIONS, LLC; J&A DRILLING AND CONSTRUCTION, LLC, MILLENIUM NETWORKS, LLC d/b/a | |

SILVER STAR COMMUNICATIONS,
WESTERN MOUNTAIN, INC., GOLD
COMMUNICATIONS EXPERT INC., and
SIGNET
CONSTRUCTION, LLC,

          Defendants.

I, Aaron G. Eskue, declare and affirm as follows:

1.      I am an attorney with the firm Powers Farley, PC, and am an attorney of record for Defendant Millennium Networks, LLC d/b/a Silver Star Communications in this matter. I have personal knowledge of the facts set forth herein.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the Deposition of Luis Garcia Diaz transcript (Volume II), taken February 12, 2026.

DATED this 24th day of March, 2026.


By__/s/ Aaron G. Eskue_____
      Aaron G. Eskue

SUPPLEMENTAL DECLARATION OF AARON G. ESKUE IN SUPPORT OF DEFENDANT MILLENNIUM NETWORKS, LLC'S MOTION FOR SUMMARY JUDGMENT [DKT. 77] – 2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 24th day of March, 2026, the foregoing document was electronically filed with the U.S. District Court. Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court CM/ECF System:

Enrique G. Serna
Attorneys for Plaintiffs
enrique@serna-associates.com

Bruce R. McAllister
Cody J. Morgan
Attorneys for Defendant Signet Construction, LLC
bmcallister@ajhlaw.com
cmorgan@ajhlaw.com

Bren E. Mollerup
Attorneys for Defendant Western Mountain, Inc.
mollerup@benoitlaw.com

Brady Hall
Attorneys for Defendant Gold Communications Expert, Inc.
brady@bhlawidaho.com


_/s/ Aaron G. Eskue_____
James S. Thomson, II
Aaron G. Eskue

**EXHIBIT A**

## PEDRO MANUEL ALCANTAR

### vs

## SIGNET CONSTRUCTION

---

## LUIS GARCIA DIAZ

## February 12, 2026

### *Volume II*



**DEPO**IDAHO

*Local Realtime Reporting & Videography Experts*

PO Box 44385, Boise, ID 83711

depoidaho.com

Luis Garcia Diaz                                                02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

---

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

PEDRO MANUEL ALCANTAR, Deceased, and survived by his wife, DULCE MARIA GONZALEZ, MARTA MEJIA VELASQUEZ, RICARDO ALCANTAR SANDOVAL; LUIS ENRIQUE SERENO, Deceased, and survived by his wife, SANDRA RUBIO MARTINEZ, individually and on behalf of her minor son, LS, and daughter, MS; JOSE GUADALUPE SANCHEZ, Deceased, and survived by MARIA MEDINA, LUCIANO SANCHEZ, LUCIANO SANCHEZ MEDINA; JAVIER GOMER ALCANTAR, Deceased, and survived by his wife, CAROLINA REBOLLO, and on behalf of her minor son EG, and daugther, SG; BRANDON PONCE, Deceased, and survived by FANNY ANDREA PONCE, CHRISTIAN PONCE, ARTURO PONCE; ABEL MEJIA, Deceased, and survived by his wife, JASMINE MOLINA, individually and on behalf of her minor daughter, [sic], HM, daughter, KM; RICARDO ALCANTAR MEJIA; JOSE ALCANTAR MEJIA; and JORGE ORTEGA,

        Plaintiffs,
vs.

LUIS GARCIA DIAZ, individually; ADRIAN SIRBU, individually; TOWER COMMUNICATIONS SOLUTIONS, LLC; J&A DRILLING AND CONSTRUCTION, LLC; MILLENNIUM NETWORKS, LLC, d/b/a SILVER STAR COMMUNICATIONS; WESTERN MOUNTAIN, INC.; GOLD COMMUNICATIONS EXPERT INC.; and SIGNET CONSTRUCTION, LLC,

        Defendants.

) Case No. 24-cv-479

) CONTINUATION OF
) VIDEOTAPED DEPOSITION
) OF LUIS GARCIA DIAZ

) Volume II-Pages 67-154

) (Taken via Zoom)

) February 12, 2026
) 1:03 p.m. MST

---

Page 69

APPEARANCES (Continued)

FOR THE DEFENDANT WESTERN MOUNTAIN, INC.:

        Michael D. Danielson
        BENOIT, MOLLERUP, DANIELSON & GRIEVE, PLLC
        126 2nd Avenue North
        Twin Falls, Idaho  83303
        danielson@benoitlaw.com

FOR THE DEFENDANT GOLD COMMUNICATIONS EXPERT, INC.:

        Brady J. Hall
        BRADY HALL LAW, PLLC
        950 W. Bannock Street, Suite 1100
        Boise, Idaho  83702
        bhlawidaho.com

FOR THE DEFENDANT LUIS GARCIA DIAZ, APPEARING PRO SE:

        Luis Garcia Diaz
        c/o Bonneville County Jail
        Inmate 172189
        900 Environmental Way
        Idaho Falls, Idaho  83401
        bhlawidaho.com

ALSO PRESENT:

        Susan H. Evans, Interpreter
        Pasha Korneychuk, Videographer

---

Page 68

CONTINUED VIDEOTAPED DEPOSITION OF LUIS GARCIA DIAZ
BE IT REMEMBERED that the deposition of Luis Garcia Diaz, held via video conference before Constance S. Bucy, a Court Reporter (Idaho CSR No. 187) and Notary Public in and for the State of Idaho, on Thursday, the 12th day of February, 2026, commencing at 1:03 p.m. in the above-entitled matter.

APPEARANCES

FOR THE PLAINTIFFS:

        Enrique G. Serna
        SERNA & ASSOCIATES, PLLC
        950 W. Bannok Street, Suite 1100
        Boise, Idaho  83702
        enrique@serna-associates.com

FOR THE DEFENDANT SIGNET CONSTRUCTION, LLC:

        Bruce R. McAllister
        ANDERSON, JULIAN & HULL, LLP
        C.W. Moore Plaza
        250 S. 5th Street, Suite 700
        Boise, Idaho  83702
        bmcallister@ajhlaw.com

FOR THE DEFENDANT MILLENNIUM NETWORKS, LLC:

        Aaron G. Eskue
        POWERS FARLEY, PC
        702 W. Idaho Street, Suite 700
        Boise, Idaho  83702
        age@powersfarley.com

---

Page 70

INDEX
EXAMINATION

LUIS GARCIA DIAZ                                    PAGE

        By Mr. McAllister                            74

        By Mr. Hall                                  94

        By Mr. Danielson                            118

        By Mr. Eskue                                131

        By Mr. Serna                                133

        By Mr. Eskue (Continued)                    143

        By Mr. Hall                                 149


EXHIBITS

NO.            DESCRIPTION                          PAGE
1 - Prehospital Care Report for Luis Garcia          78
2 - Statement of Giovanni Silva Pozos                82
3 - Statement of Anival Ponce Gallegos               82
4 - ISP - Collision Analysis and Reconstruction      83
    Report
5 - Idaho Falls Community Hospital Emergency          85
    Department, Discharge Instructions
6 - EIRMC, Alcohol Screening and Brief               89
    Intervention Cage Tool

---

DepoIdaho, PO Box 44385, Boise, ID 83711   (208) 345-3704

Luis Garcia Diaz                                                   02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

---

Page 71

E X H I B I T S (Continued)

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 7 - Transcript of Change of Plea Hearing, June 10, 2025 | | 91 |
| 8 - Judgment of Conviction | | 93 |

---

Page 73

represent Western Mountain, Inc. I am taking this remotely and I'm alone in my conference room.

MR. HALL: Brady Hall, counsel for -- go ahead.

MR. ESKUE: Aaron Eskue on behalf of Millennium Networks taking this deposition remotely and I'm alone in my office.

MR. HALL: Brady Hall, counsel for the Defendant Gold Communications Expert and I am remote and alone in my office.

SUSAN H. EVANS, an interpreter, having been first duly sworn to translate from English to Spanish and Spanish to English, translated as follows:

LUIS GARCIA DIAZ, produced as a witness at the instance of the Defendant Signet Construction, LLC, having been first duly sworn to tell the truth, was examined and testified as follows:

MR. MCALLISTER: Okay, thank you, Connie.

---

Page 72

Whereupon the deposition proceeded as follows:

THE VIDEOGRAPHER: We are now on the record. My name is Pasha Korneychuk representing DepoIdaho. The date today is February 12th, 2026, and the time is 1:03 p.m. This deposition is being held via Zoom.

The caption of this case is Pedro Manuel Alcantar, et al., versus Luis Garcia Diaz, et al., Case No. 24-cv-479. This case is filed in the United States District Court of Idaho. The name of the witness is Luis Garcia Diaz.

The attorneys and -- the attorneys attending remotely will identify themselves and the parties they represent, after which our court reporter Connie Bucy will swear in the witness and the interpreter and we can proceed.

MR. MCALLISTER: Yes, my name is Bruce McAllister. I represent Signet Construction and I am taking this deposition remotely and there's nobody in the room with me.

MR. SERNA: Enrique Serna. I represent the Plaintiffs in this case and we are taking the deposition remotely and I'm alone in my office.

MR. DANIELSON: My name is Michael Danielson. I

---

Page 74

EXAMINATION

BY MR. MCALLISTER:

Q. Could you please state your name for the record?

A. Luis David Garcia Diaz.

Q. And where was your place of birth?

A. Columbia.

Q. And when did you arrive in the United States?

A. Four years ago.

Q. Have you ever been a legal resident of the United States?

A. No, ma'am.

Q. What is your present residence, sir?

A. I'm in the Bonneville County Jail.

Q. And how long have you resided at the Bonneville County Jail?

A. It's going to be two years.

Q. And you have been convicted of two counts of vehicular manslaughter under the influence of alcohol?

A. Yes, sir.

Q. Do you have any pending appeals to the Idaho Supreme Court or Idaho Court of Appeals?

A. No.

Q. Let's go back to May 18, 2024. Were you involved in a car accident on that date?

---

Luis Garcia Diaz                                    02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

Page 75

A. Yes.

Q. And you were driving a Ram truck owned by Adrian Sirbu?

A. Yes. I don't know who it belonged to, but I was indeed driving a Dodge -- a Ram truck.

Q. Have you ever talked to or communicated with someone who represented himself to be Adrian Sirbu?

A. No.

Q. Who gave you the keys to that Ram truck?

A. An interpreter. One of his workers, but I don't remember the name.

Q. Do you remember the first name?

A. No.

Q. But it was a worker that identified himself as a worker for Adrian Sirbu?

A. I don't know if it was a worker or a friend. I have no idea. I don't know what relationship he had with him.

Q. But the person who gave you the keys said that he had some type of relationship with the owner of the vehicle?

A. He didn't say anything. He just gave me the key.

Q. And for how long had you been driving that Ram truck owned by Adrian Sirbu?

Page 76

A. Two weeks.

Q. Did you ever drive the Ram truck for anything other than a work purpose?

A. No.

Q. Now, let's go to the traffic accident. You were driving at around 5:30 in the morning on May 18, 2024?

A. Yes.

Q. Why were you driving so early in the morning?

A. I was on my way to pick up some tools.

Q. And where were those tools located?

A. In Idaho Falls.

Q. Do you remember the address of the location where those tools were being housed?

A. I don't remember.

Q. Do you remember on what street?

A. I don't remember.

Q. What tools exactly where you attempting to pick up early in the morning?

THE INTERPRETER: This is the interpreter speaking. The connection was a little -- not working well at the moment. I'm going to ask the witness to repeat the answer.

The interpreter would need a moment to search a word.

(Pause in proceedings.)

Page 77

THE INTERPRETER: The interpreter would like to clarify a term with the witness, may I --

MR. MCALLISTER: Sure, that would be fine.

THE INTERPRETER: -- for clarification purposes?

THE WITNESS: A compactor to compact the dirt.

BY MR. MCALLISTER:

Q. Now, that was May 18, 2024, the date of the accident; correct?

A. Yes.

Q. And is it true that you crossed two center lines and were traveling the wrong way down the roadway right before the collision?

A. I don't remember anything regarding the accident because I was unconscious.

Q. You were passed out?

A. I had a fracture on the hip and I had passed out. I don't remember anything regarding the accident.

Q. Did the accident wake you up?

A. I don't remember anything about the accident.

Q. Do you remember an ambulance arriving at the scene of the accident before 6:00 a.m. in the morning on May 18?

A. I don't remember anything regarding the accident. I just remember when I woke up at the hospital two days later.

Page 78

Q. Isn't it true that you were placed on a stretcher and then taken into the ambulance?

A. I don't remember anything about how I was taken to the hospital or where I was put to be taken to the hospital.

Q. Did you tell the ambulance driver when you were in the ambulance that you had crossed over the center line and struck another vehicle going the opposite way?

A. I don't remember having -- I don't remember having talked to anyone.

Q. And isn't it true that you told the ambulance driver and the ambulance staff that you did not recall losing consciousness?

A. I don't remember having talked to anyone. I had temporary loss of memory. I just remember when I woke up at the hospital.

Q. Do you remember in the ambulance that you told the ambulance staff, the paramedics, that you had pain in your left leg and your left hamstring, but that you had no other complaints of injury?

A. I don't remember anything regarding the accident.

Q. Okay, I show you what has been marked as Exhibit 1.

(Exhibit No. 1 was marked for identification.)

Luis Garcia Diaz                                                    02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

Page 79

BY MR. MCALLISTER:

Q. Do you see a document on the screen?

A. Yes, yes, I can see it.

Q. Okay. Now, the first page of the document is in English and then the second page is translated into Spanish.

A. Okay.

Q. And I will read in English what has been identified in the middle of that page HPI, history of present injury, and I quote, "Patient was driving a pickup when he said he fell asleep. He said he believes he crossed over and struck another vehicle. Patient states he does not recall losing consciousness. He stated he had pain in his left leg with a Charlie horse in his left hamstring. Patient had no other complaints of injury."

And now I show you the -- and point to an arrow the Spanish translation of that.

THE INTERPRETER: This is the interpreter speaking, Mr. McAllister. This is not the translation of that paragraph you just read.

MR. MCALLISTER: Oh, okay. Is it the one below?

THE INTERPRETER: No, it is not.

MR. MCALLISTER: Okay. Okay, well, then we'll go to Plan B. I'd simply ask to -- I'd simply ask that

Page 80

my statement that I read in English be translated into Spanish.

THE INTERPRETER: Very well, Mr. McAllister. This is the interpreter speaking. Since it is a quote, I would ask if you would change the screen and move the screen up so I can the see the original and I can perhaps sight translate that paragraph.

MR. MCALLISTER: Right here.

(Interpreter is translating a portion of Exhibit No. 1.)

BY MR. MCALLISTER:

Q. Does this statement in your Idaho Falls ambulance service record refresh your memory at all?

A. I don't remember having spoken with anyone. I just had some loss, some memory loss, and I don't remember much of the accident.

Q. Okay, Luis, I'm going to go ahead and read a statement of an individual who was in the ambulance and then I'll have a question for you.

A. Okay, yes, sir.

Q. This is a statement of Giovanni Silva Pozos and it reads as follows: "I am Giovanni Silva Pozos. I read the statement and it is correct."

"On May 18, 2024, I was a passenger in the Signet van. We were traveling to our work site early in

Page 81

the morning when the crash happened. I remember being taken to the hospital by ambulance after the accident. I was sitting in a back seat of the ambulance along with Anival Ponce Gallegos. Luis Garcia-Diaz was on a bed in the ambulance. He was the one who drove the truck that crashed into our van. Garcia-Diaz said to us that he fell asleep and his truck then crossed the center line and hit our van."

THE INTERPRETER: Mr. McAllister, this is the interpreter speaking. I apologize, sir, would you have that statement on the screen or if I need to interpret that, that's too long for me. I would ask that you would pause every so often so that I can catch up, but if you have the statement and you can put it on the screen, you may continue reading it to the end and I can sight translate.

MR. MCALLISTER: Sure, here it is and here's the Spanish.

THE INTERPRETER: Thank you.

MR. MCALLISTER: I mean, here's the English and here's the Spanish version. I'll show you whatever -- whichever one you prefer.

THE INTERPRETER: Yeah, I don't recognize this Spanish translation, so I would think I'd rather do the original.

Page 82

(Interpreter is translating Exhibit No. 2.)

BY MR. MCALLISTER:

Q. Do you agree that you told an individual in the ambulance that you had fallen asleep and your truck crossed the center line and hit the Signet van?

A. Those statements I have as part of my discovery regarding my process, my conviction, but I don't remember having talked to anyone. After the accident, I don't remember having talked to anyone. I don't remember how I was transported to the hospital, with which people I was transported there. My memory probably because of the accident and maybe I got hit in the accident, I can't remember who took me to the hospital, who I was with.

MR. MCALLISTER: I show you what's -- that was Exhibit No. 2 and now I'll show you what's marked as Exhibit No. 3.

(Exhibit Nos. 2 & 3 were marked for identification.)

BY MR. MCALLISTER:

Q. And I'll read this statement to you as well. The statement is of Anival Ponce Gallegos and it reads as follows: "I am Anival Ponce Gallegos. I read the statement -- I read this statement to be sure it is accurate."

"On May 18, 2024, I was a passenger in the

DepoIdaho, PO Box 44385, Boise, ID 83711  (208) 345-3704

Luis Garcia Diaz                                                02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

Page 83

Signet van going to a construction site early in the morning when a truck drove into our van. After the crash, I was placed in an ambulance. Another Signet employee - Giovanni Silva Pozos - was sitting in the back of the ambulance with me. Luis Garcia-Diaz was laying on a bed in the ambulance. He was the driver of the truck which hit our van. Garcia-Diaz told us while in the ambulance that he was sorry for causing the crash by crossing the center line."

Q. Did you tell the occupants of the ambulance that you were sorry for causing the crash by crossing the center line?

A. This same statement I have in my discovery, as I told you previously, but I don't remember having talked to anyone. I don't remember how I was taken to the hospital or where I was put in to be taken to the hospital.

Q. I show you what has been marked as Exhibit No. 4.

(Exhibit No. 4 was marked for identification.)

BY MR. MCALLISTER:

Q. And that's the English version here and a portion of that is translated into Spanish here, and I'll read a portion of that yellow highlighted area.

"Garcia-Diaz arrived at the Idaho Falls

Page 84

Community Hospital at approximately 6:30 hours. Blood was collected by the emergency department staff at approximately 6:34 a.m. Garcia-Diaz's blood testing showed negative results for therapeutic drugs but showed an ethanol level of .192."

"During the collision investigation, Trooper Larrea requested a search warrant to allow for collecting blood from Garcia-Diaz. A blood sample was collected from Garcia-Diaz at approximately 10:31 a.m. hours. The blood sample was sent to the Idaho State Police Forensic Services for testing. The testing of this blood sample showed the presence of ethyl alcohol at a level of .078, also reported as Blood Alcohol Content of .078 percent."

I have some questions that arise out of this.

Q. Do you recall any staff member at the Idaho Falls Community Hospital drawing your blood one hour after the accident around 6:34 a.m. on May 18?

A. I don't remember.

Q. Do you remember five hours after the accident around 10:31 a.m. that a second blood draw was obtained from you, which was also tested for your blood alcohol level?

A. I don't remember.

Q. Isn't it true that the first blood draw taken one hour after the accident yielded a blood alcohol level

Page 85

which showed that you were more than twice the legal limit of alcohol in your blood?

A. If the papers say it.

Q. Yes, they do.

A. Yes, I was found guilty. I have been sentenced for those charges, two charges of involuntary manslaughter, vehicular manslaughter as you already know and as you said in the beginning.

Q. Yes, and with respect to the blood alcohol which was drawn five hours after the accident, isn't it also true that that blood alcohol level five hours after the crash demonstrated clearly that your blood alcohol level was well over the .08 limit at the time of the crash; is that not true?

THE INTERPRETER: This is the interpreter speaking. The interpreter needs a moment.

THE WITNESS: I know.

BY MR. MCALLISTER:

Q. Okay. Now, I'm showing you some medical records from Idaho Falls Community Hospital.

(Exhibit No. 5 was marked for identification.)

BY MR. MCALLISTER:

Q. Do you remember your stay at Idaho Falls Community Hospital as opposed to Eastern Idaho Regional Medical Center?

Page 86

A. I remember from two days after.

Q. And I show you and we have here around, let's see, one, two, three, four, five, six pages in English and approximately the same number in Spanish from the Idaho Falls Community Hospital stay, and this first page translated into Spanish indicates that you arrived at the Idaho Falls Community Hospital around 6:30 a.m. and that you received a diagnosis of alcohol intoxication; is that correct?

THE INTERPRETER: The interpreter -- this is the interpreter. The interpreter will ask the witness to repeat the answer.

THE WITNESS: The question, please, can you repeat it?

BY MR. MCALLISTER:

Q. Yeah, do you agree with this diagnosis of alcohol intoxication?

A. I already pled guilty in court. I was found guilty in court. I just don't know why you keep asking me about this when I have already pled guilty of that and I assume -- I accept the responsibility of that and I'm paying my time.

Q. Okay, very well. Now, we turn to the Idaho Falls Emergency documentation and in English, this reads, "Ethanol Level: 192.6 mg/dl - normal range between 0.0

Luis Garcia Diaz                                              02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

Page 87

and 30."

Q. Do you have any reason to dispute those figures?

A. I have -- I don't know, five hours after the accident the results were lower than 0.08. That's why there was so much litigation in court regarding this, but I pled guilty for two felonies.

Q. So let's turn to the next page under History of Present Illness and I'll read a portion in English and it can be translated to you in Spanish.

"Patient was reportedly a driver in a multi-vehicle accident. He reports that he fell asleep at the wheel. Patient complains of left hip pain and thigh pain only. He denies head or neck pain. He denies any chest or abdominal pain."

Isn't it true that you told an Idaho Falls Community Hospital emergency doctor that you denied head pain?

A. I don't remember anything until two days later. I don't remember talking to any doctor until two days later until I spoke with the doctor who did the surgery.

Q. And that was the surgery on your leg or hip?

A. Yes.

Q. Let's turn to an additional page, which is a Questionnaire for Alcohol Problem Screening and I'll read it in English.

Page 88

First question: "Have you ever felt you should cut down on your drinking?"

Answer: "Yes."

Third question: "Have you ever felt bad or guilty about your drinking?"

Answer: "Yes."

Fourth question: "Have you ever had a drink first thing in the morning to steady your nerves or to get rid of a hangover eye opener?"

Answer: "Yes."

I'll represent to you that this is a questionnaire that you were given the morning of the accident.

Are your answers to this questionnaire accurate?

A. I don't remember filling that out.

Q. Well, are the answers correct?

A. No.

Q. Okay, I'll have you turn to the next page and I read this line here, Diagnosis: "Alcohol intoxication." Diagnosis: "Alcohol intoxication."

Are those diagnoses correct?

A. I don't know.

Q. So do you remember where you had your orthopedic surgery? Was that at Eastern Idaho Regional Medical Center?

Page 89

A. I don't -- I don't remember. I don't know what the name of the hospital is, but I do know that I had a surgery.

Q. Do you remember the name of the doctor who performed the surgery?

A. No, sir.

Q. I show you what has been marked Exhibit No. 6.

(Exhibit No. 6 was marked for identification.)

BY MR. MCALLISTER:

Q. I represent to you that these are two pages from Eastern Idaho Regional Medical Center incoming patient form and I point to your arrival at Eastern Idaho Regional Medical Center at 11:45 a.m., arrival time 11:45 a.m., and then at that time you had a normal blood pressure of 112/59 and an oxygen saturation rate also normal at 92 percent.

Did I read those figures correctly based upon the Spanish translation of the incoming patient form that I'm showing you at this point?

Then I have another question. There's another alcohol screening test here at Eastern Idaho Regional Medical Center and I'll read a couple of questions and answers.

"Do you drink alcohol"?

"Yes."

Page 90

"Have you ever felt you should cut down on your drinking?"

"No."

"Have you ever felt bad or guilty about your drinking?"

"No."

Do you recall answering questions on this alcohol screening and intervention tool?

A. I have repeated to you over 10 times that I don't remember anything. I just remember two days after the accident when I was going to have the surgery. I don't remember filling out any forms. I don't remember talking to any doctors. I don't remember answering any of those questions.

Q. Are these questions that represent that you answered them, are they accurate or false?

A. I don't remember having answered any of those questions.

Q. Okay, with that in mind, are your answers correct?

THE INTERPRETER: The interpreter would ask the witness to repeat the answer.

THE WITNESS: I don't know. I don't know because I wasn't conscious when I answered those questions.

Page 91

BY MR. MCALLISTER:

Q. Do you remember -- do you remember being prosecuted for six counts of vehicular manslaughter with alcohol?

A. I am guilty of them right now.

Q. Right, so you remember the six charges to which you entered a plea deal to plead guilty to two of the six charges of vehicular manslaughter while intoxicated; correct?

A. Yes.

Q. And we have two more exhibits left. I have eight exhibits total and we're on No. 7.

(Exhibit No. 7 was marked for identification.)

BY MR. MCALLISTER:

Q. I'll represent to you that I obtained a transcript of your Change of Plea Hearing on June 10, 2025, and your Sentencing Hearing on September 2, 2025.

Do you remember attending your Change of Plea Hearing in June and your Sentencing Hearing in September of last year?

A. Yes, sir.

Q. And you will see I've taken selected portions of these two hearings, the first section in English and then the next section in Spanish, and I will read the yellow highlighted portion in English.

Page 92

It says Mr. Meikle, and I quote, "We reviewed all of the data regarding the investigation around the crash. Spoken with my client at length with -- with an interpreter. And we have determined that this is the best option for him."

Is Mr. Meikle your attorney?

A. Yes, sir.

Q. And your attorney and you determined that your plea of guilty on the two vehicular manslaughter charges was the best option available for you; correct?

A. Yes, sir.

Q. And then you will see page 7 in Spanish and I will read it in English and have a question for you.

"THE COURT: Did anyone pressure or coerce you into this plea?"

"THE DEFENDANT: No, Your Honor."

"THE COURT: Are you pleading guilty freely and voluntarily?"

"THE DEFENDANT: Yes, Your Honor."

Are these statements accurate to the best of your recollection?

A. Yes, you're -- yes.

Q. And I'll read another section at page 26 of the sentencing transcript and this is from the Court and I quote, "The immeasurable loss outweighs anything that

Page 93

this Court can do to restore those that have lost so much and make you whole."

"As such, the Court pronounces sentence that follows the State's recommendation for 6 years fixed, 9 years indeterminate, for a unified sentence of 15 years."

"A similar sentence on Count II, 6 years fixed, 9 years indeterminate for a unified sense of 15 years. That is the maximum under the law."

Did we read the Court sentence correctly?

A. Yes.

Q. And I show you our last exhibit, Exhibit 8.

(Exhibit No. 8 was marked for identification.)

BY MR. MCALLISTER:

Q. And I'll represent that this Exhibit 8 is the Judgment of Conviction, which is identical to the Court's sentencing transcript, "Count I: For the crime of Manslaughter-Vehicular a minimum fixed and determinate period of custody of six (6) years, followed by an indeterminate period of custody of up to nine (9) years for a total unified sentence not to exceed fifteen (15) years."

And for Count II, it is precisely the same.

Did we read that judgment correctly?

A. Yes, ma'am.

MR. MCALLISTER: No further questions at this

Page 94

time. I pass the witness.

MR. SERNA: Anybody else wants to go? I would like to go last.

MR. MCALLISTER: Is this a good time to take a brief break of five or ten minutes?

MR. SERNA: Absolutely, and then I'd like to known if Aaron, Brady, or Michael have any questions for Luis and then I'll do it.

MR. HALL: This is Brady, I'm going to have some questions and I'm happy to go next after the short break.

MR. MCALLISTER: That sounds good. We'll be back -- is that okay for everybody? We'll be back in five to ten minutes?

MR. SERNA: Sure.

MR. HALL: Works great, thank you.

THE INTERPRETER: All right, off the record at 2:14.

(Recess.)

THE VIDEOGRAPHER: Back on the record at 2:31.

EXAMINATION

BY MR. HALL:

Q. Good afternoon, sir. My name is Brady Hall and I'm an attorney that represents one of the Defendants,

Page 95

Gold Communications Expert, Incorporated.

Let me ask you a couple questions to begin. You do understand that you're under oath; correct?

A. Yes, sir.

Q. And you understand that since you're under oath, you are required to tell the truth today; correct?

A. Yes, sir.

Q. And you also understand that not telling the truth while under oath is illegal?

A. Yes, sir.

Q. Do you understand that lying while under oath can be punishable by jail?

A. Yes, sir.

Q. Now, your boss at the time of the May 18th, 2024, accident was Jaime Vasquez Lopez; correct?

A. I just remember his name Jaime.

Q. Can you see the screen here, sir?

A. Yes, ma'am.

Q. Do you see the driver's license which has been produced in discovery as Gold 146?

Sir, do you recognize the individual in the driver's license that is on this document before you marked as Gold 146?

A. Yes.

Q. And is the individual pictured in that

Page 96

photograph on the driver's license the individual you knew as Jaime Vasquez Lopez?

A. Yes, I knew him by Jaime.

Q. And Jaime hired you to work for him and J&A Construction; is that correct?

A. I don't remember the name of the company. I just worked.

Q. You do agree, though, that Jaime was your boss at the time of the May 18, 2024, accident; correct?

A. Well, he didn't pay me. The people who paid me were the people from Romania.

Q. Do you recall previously having your deposition taken in this case?

A. Yes.

Q. And at the time of that deposition, did you tell the truth?

A. Yes, sir.

Q. Since you provided testimony in your deposition last time, have you spoken with anybody about this case?

A. No, sir.

Q. Have you ever spoken with any of the attorneys that you see here on the Zoom call today?

A. No, sir, just in the meetings. I've never spoken with them.

Q. Have you spoken with anybody who represented to

Page 97

you that they work for any of the attorneys who are representing parties in this lawsuit?

A. No, sir.

Q. Is there any reason why you cannot testify truthfully today?

A. No, sir, I'm speaking the truth.

Q. Are you on any medications that impair or limit your ability to testify truthfully and accurately today?

A. No, sir.

Q. When was the last time you spoke to Jaime?

A. When I was at the hospital.

Q. Is that the last time?

A. Oh, sorry. It's been a year, almost two years.

Q. But the last time you spoke to Jaime was at the hospital following the accident on May 18, 2024; correct?

A. Yes, sir.

Q. On May 18, 2024, did you have a cell phone?

A. May -- May 28th I was in jail. I didn't have a cell phone.

Q. I can rephrase it. I believe I asked, but I'll just reask the question, on the day of the accident, May 18th, 2024, did you have a cell phone?

A. Yes, sir.

Q. And do you remember the number for that cell phone that you used on the day of the accident?

Page 98

A. No, sir.

Q. Do you recall the provider that provided the services for that cell phone?

Was it Verizon or AT&T? Do you know?

A. No, sir, I don't remember.

Q. Do you know where your cell phone is now?

A. It's -- I have no idea where it is. The police took it away from me when they brought me to the jail. I have no idea where it is, where that phone is.

Q. Was that a work cell phone provided by Jaime?

A. No, it was my personal phone.

Q. Did you pay for the services on that phone yourself?

A. Yes, sir.

Q. Did you separately have a phone that Jaime provided to you?

A. No, sir.

Q. Did you pay for your personal phone by check or credit card or debit card?

A. No, that one was paid by a friend of mine because it was a shared plan.

Q. Who was your friend that paid for that plan?

A. My friend who paid for that plan was an American, but I don't remember his name very well.

Q. Do you remember his name at all?

Luis Garcia Diaz                                                02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

Page 99

A. Douglas, but I don't remember his name. I gave him the money. Since I didn't have the account, I would send the money to a friend and my friend would send it to him. Whoever would have an account or a card, I would give them the cash and they would send it to him.

Q. On the day of the accident, did you have a bank account?

A. No, sir.

Q. Did you have a credit card or debit card?

A. No, sir.

Q. In the 24 hours prior to the accident, did you receive any phone calls on your cell phone?

A. Yes, from my mom, from my friends, my siblings, my family, my dad. From my family in Columbia, they would call me every day.

Q. Did you ever receive work calls on that cell phone number?

A. Well, from the -- my coworkers, we would ask each other where the work was going to be, how many feet, what kind of job it was.

Q. Did you ever receive texts or phone calls from Jaime on that cell phone?

A. Yes, sir.

(Reporter inquiry.)

Page 100

BY MR. HALL:

Q. In the 24 hours prior to the car accident, did you receive any phone calls from anyone other than friends and family?

A. I don't remember.

Q. Mr. McAllister asked you a couple of questions earlier today about the Ram truck you were driving at the time of the accident. I'm going to refer to that truck as the Ram truck, okay?

A. Yes, sir.

Q. And you testified earlier today that you never drove that Ram truck for any other reason other than work; correct?

A. Yes, sir.

Q. And that's because Jaime, your boss, had told you that you could not use the Ram truck for any other reason than work; isn't that correct?

A. Nobody told me. I knew that.

Q. How did you know that?

A. Because it was provided to me for work.

Q. And you had a personal truck; correct?

A. Yes, sir.

Q. And you would use your personal truck for all personal reasons; correct?

A. Yes, sir.

Page 101

Q. Did you ever use your personal truck for work?

A. Every day.

Q. I want to ask you a couple of questions about what you just said.

Did you say that you used -- you would use your personal truck for work?

A. Yes, sir.

Q. And how would you use your personal truck for work?

A. Because we used it to move workers around. We'd use it to carry small things, like tools, the people. Every day I used it for work and for my own personal reasons. I used it for both things.

Q. Do you recall using the Ram truck to haul a trailer with a drill on it?

A. No, I didn't use drills.

THE INTERPRETER: The interpreter would need a moment to clarify something with the witness, may I?

MR. HALL: Absolutely.

THE WITNESS: I worked with air missiles, which are like bullets that go in the dirt and they perforate the ground.

BY MR. HALL:

Q. Did you use the Ram truck to haul a trailer hauling equipment?

Page 102

A. When it was necessary to bring the dumpster to carry dirt, yes, sir.

Q. Are you saying that you used a dump trailer and used the Ram truck to pull the dump trailer?

A. Yes, sir.

Q. Did you ever give the keys to the Ram truck to anybody else?

A. The workers would use it, also, when they needed to do the same activity, when they required to carry things that were heavy.

Q. Did Jaime hold onto the keys for the Ram truck?

A. No.

Q. Who would keep the keys for the Ram truck when other workers weren't using it?

A. Me.

Q. Did you ever take the Ram truck to your Airbnb where you were staying?

A. Yes, sir.

Q. Would you on occasion leave the Ram truck at the site where you were working?

A. No. We would just leave the trailers.

Q. So it was your understanding that you were never to use the Ram truck for any reason other than work; correct?

A. It was never told to me, but I had that clear.

Luis Garcia Diaz                                                    02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

Page 103

Q. You never drove the Dodge Ram, the Ram truck, on a Saturday or Sunday; correct?

A. The day I had the accident, I don't remember, but I didn't drive it on Saturdays or Sundays. I just had it for a week.

Q. You only used the truck, the Ram truck, for a week; is that correct?

A. Yes, all of us who worked together used it.

Q. And you understood that you were not to use the Ram truck on Saturdays and Sundays; correct?

A. It was never told to me, but I never did it.

Q. And did you have any other jobs other than working for Jaime in May of 2024?

A. No.

Q. In May of 2024, did you ever work on weekends, Saturdays or Sundays?

A. Sometimes Saturday mornings.

Q. How many Saturday mornings did you work in May of 2024?

A. I don't remember. I don't remember. There weren't many. I think it was just one.

Q. You testified earlier today that you were on your way to pick up a compactor, is that correct, at the time that the accident occurred?

A. Yes, sir.

Page 104

Q. And let me clarify something. Had you — at the time that the accident occurred, had you already picked up this compactor or were you on your way to pick up the compactor?

A. Well, it seems that I had already picked it up, because I saw the pictures of my accident in my discovery and the compactor was there laying on the ground.

Q. When did you see those photographs of the accident and the compactor on the ground?

A. In my full discovery.

Q. Was that in your criminal case?

A. Yes. I've been in jail for two years.

Q. And did your attorney in your criminal case show you those photographs?

A. Yes, in my full discovery there is all the evidence regarding the accident, pictures, descriptions of the accident, everything.

Q. When was the last time you looked at the photographs of the accident?

A. I look at them every day, because I ended up traumatized with that accident. It has been very difficult for me, so I -- excuse me, I keep those pictures under my dormitory and I see them every day.

It's not easy for me to talk about this subject. It has been very difficult, but I am -- I have a good

Page 105

disposition to talk about it right now.

THE INTERPRETER: The interpreter would like to make a correction.

THE WITNESS: I am willing to talk about it.

BY MR. HALL:

Q. So did you look at the photographs of the accident today?

A. Yesterday.

Q. Yesterday?

A. Yes.

Q. Where were you -- or where did you pick up the compactor at on the day of the accident?

A. I don't remember. I just remember when I left the house on the truck.

Q. Other than the accident, what's the last thing that you remember?

THE INTERPRETER: This is the interpreter speaking. Counsel, can you repeat the question?

BY MR. HALL:

Q. Yeah, prior to the accident, what is the last thing you remember?

A. I just remember having left the house. I don't remember very much.

Q. Do you remember what time you left the house?

A. I don't remember.

Page 106

Q. Had you ever been to Idaho Falls prior to the accident?

A. No. I didn't know -- I mean, I don't know the place. Before the accident, I was working in Utah.

Q. But prior to the accident, had you ever been to Idaho Falls?

THE INTERPRETER: The interpreter would like to clarify something with the witness, may I?

MR. HALL: Yes.

THE WITNESS: No, I had just drove by here to go to Rexburg.

BY MR. HALL:

Q. What part of town did you pick up the compactor in Idaho Falls on the day of the accident?

A. I don't know. I don't know the place. I don't know the area. I -- my memory is not good. I can't remember where I went or where I picked it up. I just remember seeing the pictures and seeing that the compactor was on the ground. It went flying and fell on the ground.

Q. Do you have any recollection as you sit here today of actually picking up the compactor in Idaho Falls?

A. I don't remember.

Q. Do you recall if the compactor was at a person's

Luis Garcia Diaz                                                                02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

Page 107

house in Idaho Falls?

A. No, I don't -- I don't remember where I picked it up. I don't remember. I just saw the picture and I saw that I had the compactor with me, because I saw it in the pictures.

Q. Do you recall if the compactor was -- well, let me rephrase that.

Do you recall if you picked up the compactor from a rental company in Idaho Falls?

A. I don't remember.

Q. Do you recall if you were picking up the compactor at a storage unit in Idaho Falls?

A. I don't remember where I picked it up.

Q. Prior to the day of the accident, you had not picked up any tools from Idaho Falls before; is that correct?

A. Yes, sir, correct.

Q. Do you recall if you had any alcoholic drinks while you were in Idaho Falls on the day of the accident, May 18, 2024?

A. I don't remember.

Q. Have you ever been to a bar or nightclub in Idaho Falls?

A. I don't remember.

Q. Do you believe you may have been to a bar or a

Page 108

nightclub in Idaho Falls prior to the accident, but you just don't remember?

A. I don't remember.

Q. Have you ever been to a restaurant in Idaho Falls?

A. No, sir. I had never been here. I had just driven by here.

Q. Now, you testified that you believe you were in Idaho Falls to pick up a compactor because in your criminal discovery, you saw a compactor on the road in one of the pictures of the accident; isn't that correct?

A. Yes, I only know that I left the house to pick up something from work -- for work, interpreter correction.

Q. As you sit here today, do you have any recollection of going to Idaho Falls to actually pick up a compactor?

MR. SERNA: Asked and answered.

MR. HALL: I'm sorry, are we waiting for the witness to answer?

THE WITNESS: Well, I came to pick up a compactor in Idaho Falls.

BY MR. HALL:

Q. And as you sit here today, you recall going to Idaho Falls on the morning of the accident to

Page 109

specifically pick up a compactor; is that true?

MR. SERNA: I'm going to object to asked and answered for the second time.

THE WITNESS: I left the house with that purpose.

BY MR. HALL:

Q. Did Jaime tell you to go to Idaho Falls to pick up a compactor on the morning of the accident?

A. Nobody told me to go. I knew what I needed to -- what I needed to do for my work.

Q. How did you know the compactor was in Idaho Falls?

A. I don't remember.

Q. Do you remember going to any other locations in Idaho Falls other than what you believe to pick up the compactor?

A. I already told you that I don't know this town. I have only driven by this town. I have never been in this town.

Q. Where were you going at the time of the accident?

A. I suppose I was going home.

Q. It's your testimony, then, that at the time of the accident, you were headed home; is that correct?

A. I don't know where I was headed.

Page 110

Q. Where were you living at the time of the accident?

A. In Rexburg.

Q. Were you living in an apartment or a house?

A. In a house.

Q. Do you recall if you had any plans for the day of the accident?

A. I don't remember.

Q. Because it was Saturday, you were not going to work that day; correct?

MR. SERNA: Objection, asked and answered.

THE WITNESS: Sometimes I would work on Saturdays as I told you.

BY MR. HALL:

Q. You have no recollection as you sit here today of any plans to work on the day of the accident; correct?

MR. SERNA: Objection, misstates testimony.

BY MR. HALL:

Q. Go ahead and answer.

A. As I told you, sometimes I would work on Saturdays.

MR. DANIELSON: This is Michael Danielson, can we take a short break? I have a concern with the constant head nodding from Mr. Serna in response to the answers that we're getting from this witness. It's not

Luis Garcia Diaz                                                    02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

Page 111

only distracting, but it is, in my opinion, bordering on leading. I just need to say something at this point.

MR. HALL: Yeah, counsel, I appreciate that. I'll join in that.

MR. SERNA: That is absolutely outrageous. I can actually put myself on a closed screen. Give me a break.

MR. HALL: I'd support that.

MR. SERNA: I will ask him questions about that when you all pass the witness.

MR. HALL: Mr. Serna, are you going to put your camera on -- are you going to turn your camera off?

MR. SERNA: Are we going to take a break or are we going to continue?

MR. HALL: Well, I don't -- do we need a break, Mr. Danielson, or we just -- that was an objection you wanted to lodge?

MR. DANIELSON: Yeah, I guess we don't need a break if we can just deal with it in this way.

MR. HALL: Yeah. I mean, to be honest, Mr. Serna, I've tried multiple times to move you off my screen just because your head nodding and walking back and forth has been distracting.

Is there any way you can, you know, turn your camera off? Is that unreasonable?

Page 112

MR. SERNA: I will turn my camera off, but I move a lot. I stand a lot. I don't sit a lot and I move my head a lot as a natural movement. There's no way you can silently be guiding a witness. You guys are full of it, okay, both you, so I will and please continue and when we need a break, let us take a break.

MR. HALL: Does anyone need an actual break right now?

MR. DANIELSON: No.

MR. HALL: Okay, thank you.

BY MR. HALL:

**Q. Sir, I need you answer the question as to whether or not you have any specific recollection as you sit here today of having any plans or intention to work on the day of the accident.**

A. I don't remember. I only know that I worked on some Saturdays. I don't remember if that Saturday I was going to work or not.

**Q. I think you testified earlier today that you may have worked on one Saturday; is that correct?**

THE INTERPRETER: One momento.

THE WITNESS: Yes, but in the community in Rexburg, you don't work a lot on those days, so it's just to pick up anything that was left from before, but on that Saturday, I just worked for one hour -- no, on that

Page 113

Saturday, I just worked for one hour to pick up any cones that were left in a bad spot and because some of the neighbors complained.

BY MR. HALL:

**Q. So is it your testimony that on the day of the accident, you picked up cones?**

MR. SERNA: Objection, misstates his testimony.

THE WITNESS: No, sir, I didn't -- no, sir, I didn't tell you that I picked up some cones that day. I told you that I left the house to pick up some tools and I suppose that I picked them up, because in my discoveries I saw that I had -- there were some tools there that I didn't have before.

THE INTERPRETER: One moment. One momento.

THE WITNESS: If I would remember, if I -- if I could remember, I would be telling you everything regarding the accident, but this was an accident where six people died. This was an accident that was very, very hard for me. There are many things that I cannot remember. I woke up two days later. I only remember starting two days after.

THE INTERPRETER: This is the interpreter speaking. May I give a warning to the witness that I may pause the witness once in a while for the sake of accuracy so that -- prevent him from going too much,

Page 114

allow me to catch up and then he may continue? I'm not interrupting his testimony. I just want to pause him and perhaps he thinks that I'm telling him to stop, so I just want to give him that warning that I'm just going to pause when he's going too long and that he may continue if he wishes; is that okay?

MR. HALL: Of course, Ms. Evans, please do.

THE INTERPRETER: Okay, very good. Thank you.

BY MR. HALL:

**Q. Sir, to be clear, I only want you to testify as to what you recall, okay?**

THE INTERPRETER: One momento.

THE WITNESS: And that's what I'm saying, and that's what I'm doing -- interpreter correction. I am testifying regarding everything that I can remember, but I am doing my best. This is not easy for me. All of this that I remember, this is not easy. I am going to be serving a 30-year sentence and it's not easy for me. I am doing everything, every effort possible to state and to state the truth.

BY MR. HALL:

**Q. I appreciate that, thank you.**

A. Yes, sir.

**Q. On the screen before you is an Idaho State Police Driver's Statement. It's marked for the record**

Page 115

Signet 02508 and 02509.

Do you see that before you, sir?

A. Yes, ma'am.

Q. And on the second page of this document marked Signet 02509, there's a signature there on the bottom.

Do you see that?

A. Yes, sir.

Q. Is that your signature?

A. Yes, sir.

Q. Do you recall as you sit here today completing the form Idaho State Police Driver's Statement?

A. I don't remember, but I would imagine that I did, but I don't remember filling it out.

Q. Sir, do you recognize the handwriting on this document as yours?

A. It doesn't look like my handwriting.

Q. Can you read this handwriting, though?

A. Yes. Yes, it's the only thing that I have been telling you regarding what you've been asking me.

Q. Sir, I've highlighted a section here towards the bottom of the first page, which is marked Signet 02508.

Can you read in Spanish the portion of the document that I've highlighted?

THE INTERPRETER: Counsel, this is the interpreter speaking.

Page 116

MR. HALL: I'm sorry.

THE INTERPRETER: Can you leave that on the screen?

MR. HALL: Yeah, I'm sorry.

THE WITNESS: "I was on my way to pick up tools for my work when the crash happened. I just remember when the firefighters helped me."

BY MR. HALL:

Q. Do you recall after the accident communicating that information to anybody?

A. I think that was a policeman and I think they helped me by writing it because I was laying on a bed.

Q. Do you recall assisting the police officer in completing this form?

THE INTERPRETER: One momento.

THE WITNESS: Yes, all of those forms I have in my discovery, and just like I told you, it's the same thing that I'm telling you for the questions you're asking me. For here, it's clear that I -- I had said that I was picking up those tools for work and that the firefighters came to rescue me. That is the truth, so it's clear that it is true. My memory after the accident was not in good shape. I can't remember many things.

BY MR. HALL:

Q. Do you speak English, sir?

Page 117

A. A little.

MR. HALL: I'm going to pass the witness. I'll reserve, though, to ask follow-up questions depending on what questions are asked and what's stated.

MR. SERNA: Who wants to go next?

Aaron, do you have any questions?

Michael, do you have any questions?

MR. DANIELSON: Aaron, do you have a preference?

MR. ESKUE: You can go ahead first.

MR. DANIELSON: I'm sorry, I couldn't catch that.

MR ESKUE: Sorry, you can go ahead first if you want.

MR. DANIELSON: Okay. Can I take a five-minute break before I begin?

MR. ESKUE: That would be great, actually.

MR. HALL: Works for me.

THE VIDEOGRAPHER: All right, off the record at 3:34.

(Recess.)

THE VIDEOGRAPHER: Back on the record at 3:45.

Page 118

EXAMINATION

BY MR. DANIELSON:

Q. Good afternoon, Luis.

A. Good afternoon.

Q. I just want to make sure that when I ask questions that you understand what I'm referring to, so when I refer to this project, I'll be referring to the Rexburg fiber optic project.

Do you understand that?

A. Yes, sir.

Q. Prior to the accident that happened on May 18th, 2024, how long had you worked on the project?

A. Three weeks.

Q. During that time, who was your employer?

A. Well, I got paid by the people from Romania. I didn't get paid by Jaime.

Q. Who did you work for?

A. Well, I obeyed the orders of the Romanians.

Q. Did Jaime tell you what to do?

A. No, I knew what I needed to do. Well, I had work -- I had people -- interpreter correction -- that worked for me. I knew everything about the job. They didn't tell me what I had to do. They would simply give me the maps and I would do all the work.

Page 119

THE INTERPRETER: They're going to change the tablet.

MR. DANIELSON: Okay.

THE VIDEOGRAPHER: Counsel, can we go off the record?

MR. DANIELSON: Yes.

THE VIDEOGRAPHER: Off the record at 3:48.

(Pause in proceedings.)

THE VIDEOGRAPHER: Back on the record at 3:51.

BY MR. DANIELSON:

Q. All right, so prior to working on the Rexburg project, who were you working for?

A. I worked independently in the City of Utah, but I didn't get paid there and I left. I learned to do this work when I was in Colorado.

Q. Are you claiming that you didn't work for Jaime prior to this project?

A. No.

Q. You didn't work for Jaime drilling prior to this project?

A. No, sir.

Q. And then how did you find yourself in Rexburg working on the project?

A. I met him in Utah.

Q. Who is "him"?

Page 120

A. Jaime.

Q. And did he offer you a job to come work on the Rexburg project?

A. I saw a publication in the internet and I told him to work in Rexburg.

Q. So you're stating that you told Jaime to work on the Rexburg project?

A. Yes.

Q. Were you Jaime's boss?

A. No.

Q. Who was paying you for the work you were doing in Utah before starting on the project?

A. I was working for a person from Mexico and he would pay me cash.

Q. Do you remember sitting for a deposition, oh, maybe about a year ago in this case?

A. Yes.

Q. Do you remember stating during that deposition that you were an employee of J&A Drilling on this project?

A. I worked for the Romanians. The Romanians paid me.

Q. Do you remember stating during that deposition that you worked for J&A Drilling on this project?

A. I don't remember for who -- I don't remember

Page 121

for -- how were the deals with that company. I just remember -- continue.

I just remember that they gave me the maps and I would work. I don't remember how they made their deals.

Q. Do you remember stating during that deposition that your boss's name was Jaime?

A. I don't remember -- I don't remember having said that Jaime was my boss. I just said that I knew him. I just remember that I said that I knew him but not directly my boss.

Q. So would the statement that Jaime was your boss on this project have been untrue?

THE INTERPRETER: One momento, momento.

THE WITNESS: Jaime and I worked together, but I don't think he was my boss. I paid for my things and he never paid me. If he would have been my boss, he would have been paying me.

BY MR. DANIELSON:

Q. So it's is your testimony here today that Jaime never paid you?

A. Jaime, not Javier.

Q. I didn't say Javier.

THE INTERPRETER: Perhaps the interpreter said Javier. I don't remember, but go ahead, counsel.

MR. SERNA: You did inadvertently, yes.

Page 122

THE INTERPRETER: Yes, okay, very good. Please, can you repeat the question, counsel?

BY MR. DANIELSON:

Q. Is your testimony here today that you did not work for Jaime on the project?

A. I worked with the contractors.

Q. What contractors?

A. Subcontractors.

Q. What subcontractors?

A. To work with the fiber in the Rexburg project. I don't have a social security number. I don't have anything. They would pay me cash.

Q. Do you remember stating in your prior deposition that Jaime paid you for your work on the project?

A. The Romanians paid me.

Q. So is it your testimony here today that that statement would have been untrue that Jaime paid you?

A. Well, Jaime, since I didn't have a bank account, he would be the one who would give me the money, but I would obey the orders of the Romanians.

Q. Do you remember in your prior deposition stating that Jaime paid you by check?

A. No.

Q. So if you had made such a statement in your prior deposition, would that be untrue?

Luis Garcia Diaz                                                    02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

Page 123

A. Well, I can't cash a check here, because I am here in the United States illegally. I can't cash a check.

Q. So if you made a statement at your prior deposition that Jaime paid you by giving you a check, was that an untrue statement?

A. They can't pay me with check. They only made one payment to me and it was a cash payment.

Q. Who paid for your Airbnb?

A. I don't know. They would just tell me to go there and it was ready.

Q. Who is "they"?

A. Well, I lived in two different Airbnb's while I was in here in Idaho. The first time was the Romanians and the second time I don't know who it was, and I asked them because I didn't have any money to pay for it and I borrowed the money.

Q. You're claiming that you borrowed money from the Romanians to stay in an Airbnb?

A. Yes.

Q. And did I hear you correctly that you're claiming that you stayed in an Airbnb with the Romanians?

A. No. I lived with the workers. I was a worker.

Q. You were a worker?

A. Yes.

Page 124

Q. How many workers were staying in your Airbnb?

A. Ten.

Q. And were you just another worker like the rest of them?

A. Well, I knew how to read the maps and the job was given to me and I would guide them.

Q. Who told you to guide them?

A. Well, they had been working with -- they came with me from Utah and they knew that I know -- that I knew how to read the maps and that I knew how to do the job.

Q. So you're saying that the people that told you what to do for the job came with you from Utah?

A. No, no, the workers that I was in charge of were coming with me from Utah.

Q. Okay, did those workers work for you or did those workers work for Jaime?

A. They worked for me.

Q. Do you own and operate a business?

THE INTERPRETER: Excuse me, this is the interpreter. Counsel, can you repeat the question?

BY MR. DANIELSON:

Q. Do you own and operate a business?

A. No.

Q. Then how did they work for you?

Page 125

A. Because I got paid a percentage and I paid them, I mean.

Q. So are you claiming that you employed them?

A. Well, I would give them work. They worked for me.

Q. So then who employed you?

A. They paid me a percentage. They paid me a percentage and they would pay me by the foot, and I got the job. I would pay for all the expenses. I would pay for the gas, for rentals.

Q. So what was Jaime's role in any of this?

A. Well, Jaime, they would pay a percentage to Jaime and they would pay a percentage to me.

THE INTERPRETER: This is the interpreter speaking. The interpreter would like to clarify a term with the witness, may I?

MR. DANIELSON: Yes.

THE WITNESS: Jaime got paid for the drilling part and I got paid for what I did, which was working with the missiles, the air missiles.

BY MR. DANIELSON:

Q. So are you claiming that you were Jaime's independent contractor?

A. Well -- well, I don't know what you're referring to, but we worked in exchange of a percentage.

Page 126

Q. What do you mean by "we"?

A. Well, he worked in the drilling part and I worked with the missiles.

Q. Who was it that told you to come from Utah to Rexburg to work on this project?

A. The person I met on the internet.

Q. And who was that?

A. I don't know. I don't remember the name. I just took a risk. I met her and I took a risk and I came.

Q. Who paid for the Airbnb?

A. I already told you.

Q. Who paid for the Airbnb?

A. The first time it was the Romanians on a loan they gave to me. I mean, I paid for it, but then I had to pay that money back to them, so I paid it.

Q. You paid for the Airbnb?

A. Yes, because in the end they discounted that money from me.

Q. So if you had stated in your earlier deposition that somebody else paid for the Airbnb, that wouldn't be true?

A. No, because, I mean, they paid it, but I -- they discounted the money from me, so I ended up paying for it, so nobody gave me anything for free.

Luis Garcia Diaz                                                          02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

Page 127

Q. Who actually made the plans with and booked the Airbnb?

A. I don't know under what name was the reservation made. I just was told to go to that house, that it was ready.

Q. And who physically paid money to the owner of the Airbnb?

A. I don't know. I don't know if it was physically or if it was a deposit.

Q. Who provided you with the tools and equipment you used on the project?

A. Some were mine and some others were from the people from Romania.

Q. So is it your testimony that neither Jaime nor J&A Drilling provided you with any tools or equipment for the project?

THE INTERPRETER: This is the interpreter. The interpreter will ask the deponent to repeat the answer.

THE WITNESS: That Jaime didn't provide anything to me to work. It was the people from Romania.

BY MR. DANIELSON:

Q. So it's your testimony here today that Jaime didn't hire you? Jaime didn't tell you what to do? Jaime didn't pay you, and Jaime didn't provide you with any equipment or tools for this project?

Page 128

A. Jaime did not provide any equipment or tool for the project. Jaime didn't have to tell me what to do. The people from Romania did, and Jaime did give me one more -- one single payment. The people from Romania gave me the payment, but he gave it to me because I didn't have an account.

Q. Was there anybody else that told you what to do while you were working on the project?

A. No one else.

Q. Okay, let's go back to May 18th, 2024, the day of the accident. You state — stated earlier, I believe, that you don't remember anything that you were doing after you left the Airbnb; is that correct?

A. Yes, sir.

Q. And the only reason you think you went down to Idaho Falls to get a compactor is because you saw the compactor in photographs in your discovery?

A. Well, I remember that I left to pick up the compactor.

Q. What do you remember about that?

A. That I left to pick up the compactor.

Q. And that's your last memory that you have; correct?

A. Yes.

Q. Do you remember why you were going to get the

Page 129

compactor?

A. I don't remember.

Q. Do you remember if anyone asked you to go get the compactor?

A. I don't remember.

Q. Do you remember where you were going to get the compactor?

A. I suppose home.

Q. You were going home to get the compactor?

A. Oh, no, I don't remember where I was going to pick it up.

Q. Do you remember who even owned the compactor?

A. I don't remember.

Q. Do you remember what caused you to wake up so early on a Saturday morning to go get a compactor?

A. I would imagine that I needed it, but I don't remember.

Q. And your intent was just to bring it back home to the Airbnb?

A. I think so or to have it in the truck available for work.

Q. But you're not sure?

A. I don't remember. I would imagine that I needed it. If I went to pick it up, it's because I needed it.

Q. During this three-week period that you say you

Page 130

were working on the Rexburg project, did you ever show up to work intoxicated?

A. No.

Q. Did you ever drink alcohol at all while on the job during this project?

A. No, sir.

Q. Were you ever disciplined by J&A Drilling and/or Jaime for drinking on the job during this project?

A. I never drank -- I never drank at work. I never drank at work.

Q. Were you ever disciplined by J&A Drilling and/or Jaime for being intoxicated while on the job?

A. I already repeated that I have never drank at work.

Q. I'm not asking if you ever drank while at work. I'm asking whether you were ever intoxicated while at work.

A. I have not been intoxicated, nor have I drank while being at work.

Q. While you were on this project, did you ever communicate directly with the homeowners?

A. No, ma'am.

MR. DANIELSON: I'm done. I pass the deponent.

MR. SERNA: Aaron, do you want to go?

MR. ESKUE: Can I get a second to look over my

Luis Garcia Diaz                                                      02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

Page 131

notes there? I know Michael covered a lot of what I was going to cover there.

EXAMINATION

BY MR. ESKUE:

Q. Mr. Garcia Diaz, my name is Aaron. I'm an attorney representing Millennium or Silver Star.

Prior to the -- I thought somebody was going to speak, sorry, so prior to the May 18th, 2024, accident, did you know who Millennium Networks was?

A. No, sir. I just know about it now.

THE REPORTER: I think Aaron may have frozen up. He's gone.

MR. SERNA: In the sake of time, I would like to ask some questions while Aaron comes back, unless anybody objects to that.

THE VIDEOGRAPHER: Counsel, do we want to go off the record while we wait for him to return?

MR. SERNA: I don't know that we have too much time and I do want to ask some questions. I will yield the floor when Aaron comes back if he has any questions.

MR. HALL: Well, I think we need to wait until Aaron gets back or someone representing his client is present. I don't think we can proceed without a party

Page 132

who for whatever reason is now unable to attend.

MR. SERNA: Ms. Court Reporter, please ask -- Ms. Interpreter -- Mr. Garcia Diaz how much more time he has.

THE WITNESS: Well, I have never been this long for something like this in this place. The meal, they distribute the meals at 4:40.

MR. SERNA: There's Aaron. Aaron, are you ready to go?

MR. ESKUE: Yeah, for some reason my computer kicked me off.

Enrique, are you in the middle of your questioning right now?

MR. SERNA: No, we were waiting for you. I would like to ask some questions, but you had the floor.

MR. ESKUE: I had to restart my computer. I'm on my phone right now and it's a little awkward, so --

MR. SERNA: Do you mind if I go while you restart your computer?

MR. ESKUE: Yeah, go ahead and I'll get this restarted and then pop back on.

Page 133

EXAMINATION

BY MR. SERNA:

Q. Mr. Garcia-Diaz, I'm Enrique Serna, how are you?

A. Hi, how are you?

Q. Do you remember you -- I took your deposition before?

A. Yes, sir.

Q. Luis, sorry for your circumstances today. That's only a statement, not a question.

A. Yes, sir, thank you.

Q. Luis, the last question Mr. Danielson asked you and I think the translation was a little muffled, but I'm going to ask it clear, did you ever physically interact with a homeowner in Rexburg in which yard you were working?

THE INTERPRETER: The interpreter did not hear an answer.

THE WITNESS: No, sir.

BY MR. SERNA:

Q. Did you ever talk to any of the homeowners in Rexburg?

A. Which houses, the Airbnb's?

Q. No, not the Airbnb, the places where you were installing the cable.

Page 134

A. Oh, yes, I did speak to some of them, because I needed to ask for permission to work in their yards.

Q. In the last deposition you told me that that Friday before the accident, you had received a text from a homeowner and that you were going there on Saturday to fix the homeowner's yard --

MR. HALL: Object to form.

BY MR. SERNA:

Q. -- is that true?

A. Yes, I think it was a sprinkler that got broken, that we broke.

BY MR. SERNA:

Q. And is that why you were going to pick up the compactor?

MR. HALL: Object to form, foundation.

BY MR. SERNA:

Q. You can answer, Luis.

A. I don't know. I don't know if that was the reason why I was going there, but, yes, I do remember that I was told that there was a complaint about a sprinkler that had been broken a day before, two days before. I don't remember.

Q. Luis, can you please describe physically the Romanian that gave you the key to the truck?

MR. HALL: Object to form.

DepoIdaho, PO Box 44385, Boise, ID 83711   (208) 345-3704

Luis Garcia Diaz                                              02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

Page 135

THE WITNESS: Well, he was tall, white, and skinny.

BY MR. SERNA:

Q. Was his name Bowden, do you remember?

A. I don't remember his name. I just remember -- or I would call them the Romanians.

Q. How many Romanians were there, Luis?

A. Well, there were two.

Q. And do you remember their names or what they called them?

THE INTERPRETER: This is the interpreter speaking. The interpreter would ask the deponent to repeat his answer.

THE WITNESS: No, I don't remember their names. They called them by friends. I don't remember their names. They were weird names.

BY MR. SERNA:

Q. In your deposition, you say that those Romanians paid for the first time for the Airbnb; correct?

MR. HALL: Object to form, misstates testimony.

THE WITNESS: Yes, they did pay, but it was like a loan they gave me, because afterwards, they discounted it from my payment.

BY MR. SERNA:

Q. Were those the same Romanians that gave you the

Page 136

key to the Dodge Ram truck?

A. Yes.

Q. When you went to work to a homeowner's yard, did you ever see anyone from the City of Rexburg telling you where to dig or not to dig?

A. No.

Q. Who -- go ahead, sorry.

A. Everything was already marked. Everything was marked with yellow paint for gas, with red paint for power, and blue paint for water.

Q. Do you know if Western Mountain was the company that marked the ground where you were supposed to dig and install the fiber?

A. I don't know. When I arrived, everything was marked.

Q. Who gave you the map to show you where you needed to install the fiber optic cable?

A. The Romanians.

Q. And do you know where the Romanians got the map from, Luis?

A. Not -- not the slightest idea.

Q. Approximately, Luis, how many houses in the city did you install fiber optic conduit?

A. That is by the foot. The thing is that you calculate that type of work by the foot. It's not --

Page 137

they don't pay you by the house. I don't remember the number of feet that we had or we ended up having in Rexburg. I don't remember the number. I don't remember.

Q. Did the Romanians tell you what to tell the rest of your crew to where install the cable?

MR. HALL: Object to form.

THE WITNESS: With a white paint, I would show them where the pipe was supposed to go and I would base that on the map.

BY MR. SERNA:

Q. How many different maps did you get during the weeks that you were working on this project?

A. Two.

Q. And the two maps were given to you by the Romanians?

A. Yes, sir.

Q. Were you the first person that knocked on a homeowner's door to tell them that you were digging in their yard fiber optic?

A. No, they had put papers on the doors days prior, but the permits were already in place is what they told us.

Q. And do you know who put the papers on the doors, Luis?

A. No, sir. I don't -- I didn't he even see the

Page 138

papers either. I was just told that there was not a problem, that I could work.

Q. May 18, 2024, was a Saturday. Do you remember that?

A. Well, I know that it was the 18th, the day of the accident, but I don't remember.

Q. At what time did you finish work the day before the accident, Luis, do you remember?

A. At around 8:30 or 9:00 at night, because in the summer, it gets dark later and so we take advantage of that to work longer.

Q. Luis, what was the percentage that they were going to pay you of the project so that then you could pay the rest of the people, do you remember?

A. They paid me $3.00 per foot.

Q. And with those $3.00, you were supposed to pay the rest of the people?

A. I paid all the workers and I paid all the expenses, gasoline, everything that was needed, materials, oil, diesel for the compressors. I covered all of the -- all of the expenses with those $3.00.

Q. And who told you they were going to pay the $3.00 a foot to you? Was it the Romanians?

A. Yes, that was the agreement I entered in with them. They were going to lend me or let me use some

Page 139

tools and that's why they were going to pay me like that. They would provide me some tools and the truck.

Q. And do you ever remember meeting Adrian Sirbu or you would not know who he is?

A. I don't know who he is. I know -- I don't know. I don't know who Adrian Sirbu may be. I did not know them by names.

Q. Did any of the Romanians see you at the detention center or at the hospital after the accident?

A. No, sir, none of them.

Q. Did Jaime Vasquez went to talk to you after you got arrested?

A. No, they don't allow visits here and I haven't talked to him either after the accident happened.

Q. Did the Romanians ever pay you for the work you had done up until the accident, Luis?

A. We never received payment.

Q. Do you know how much --

A. They discounted everything with the truck that got damaged and all of that.

Q. I want for you to explain to me what you mean that they discounted everything from you because of the damaged truck and all that you mean, please.

A. Serna -- Serna, they didn't pay me because I damaged the truck, so the truck needed to be paid. I

Page 140

suppose that what they owed me I had to pay because I damaged the truck.

Q. And who told you that, Luis, and when?

A. Well, nobody told me, but I never received any money.

Q. The people that were – that you were paying, were they all Latin?

A. Yes, sir, and I had to pay to them the days that we worked for from my savings because we didn't receive payment. They were all Mexicans and from Honduras.

Q. Luis, do you know if they had any immigration papers, any of them?

A. Well, I had immigration papers, the rest didn't, because I entered through political asylum. I was -- had some issues in Columbia and they gave me asylum and I had been attending to court, but unfortunately, the accident happened.

Q. All the documents that you were shown on the screen today by all the lawyers that asked you questions, do you remember seeing the documents?

A. I have all of them in my discovery.

Q. And -- but you don't remember specifically talking to the police about each and every one of those documents?

A. Well, the documents, when the doctors asked me

Page 141

those questions, I mean, at first, in the beginning, I was in a shock. I had had a very serious accident and I didn't remember. I don't remember. I only remember starting two days after when the police came and asked me some questions. I don't remember anything else.

Q. And did the police ask you specifically if you remember who you worked for?

A. Well, they asked me -- well, I don't remember that question. It's been so long.

Q. Whatever is in the reports, it's there in the reports and you saw it in your discovery file?

A. Yes. All of the papers, the majority of the papers, that the previous attorneys showed me, they're all in my discovery.

Q. Luis, during the weeks that you worked in installing fiber optic, do you ever remember going to a warehouse to pick up equipment, any day?

THE INTERPRETER: The interpreter would like to clarify a word that the interpreter did not hear from the deponent, may I?

MR. SERNA: Of course.

THE WITNESS: I had said here before that yes, I had been to a warehouse to pick up some work boxes, work boxes with tools. I don't remember the address, but I do remember going to pick up some materials there.

Page 142

BY MR. SERNA:

Q. Luis, do you remember the company that owned that warehouse by any chance?

A. I don't remember. No, sir, I don't remember. I do remember that I would go there. I would enter the address in my cell phone and I would get there through my GPS, but I don't remember what company it was, what was the name of the company. I don't remember.

Q. Luis, the last deposition that I took of you, you answered the questions honestly and with the truth; correct?

MR. MCALLISTER: I object to the form of the question.

THE WITNESS: Yes, sir.

BY MR. SERNA:

Q. In today's deposition, in all these questions that you have been asked today, you are being truthful to the best of your ability under oath?

A. I have done everything possible to answer all the questions in the best way possible with the truth. I have answered all the questions. All the questions that you have asked of me, I have answered with the truth.

MR. SERNA: Luis, I thank you very much for your time and I am very sorry about your circumstances. I pass the witness.

Luis Garcia Diaz                                                                02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

Page 143

THE WITNESS: Likewise to you and to all the attorneys present. May God bless you and protect you from all evil.

MR. SERNA: There might be one other lawyer, Luis, that wants to ask some questions, Aaron, but I'm done. Thank you.

THE WITNESS: Thank you.

EXAMINATION

BY MR. ESKUE: (Continued)

Q. Thank you, Luis, sorry for that last attempt here. I lost the internet and whatnot, so hopefully this will be sustainable.

A. No worries, sir. No worries, sir.

Q. So a lot of areas that I was going to ask about have been covered, so I just want to swing to what Mr. Serna had just asked you about visiting a warehouse and I think in that testimony, you mentioned that you would go to this warehouse and pick up work boxes; is that correct?

A. Yes, sir.

Q. And what were these boxes?

A. These were some plastic boxes that you put in the sand for when the pipe gets there.

Page 144

Q. So they weren't like work boxes that would hold tools; correct?

A. No, they were boxes that you needed to put to finish the job and to deliver the job finished.

Q. I don't want to misstate your testimony, but I believe I heard you say that you would get boxes at this warehouse or pick up boxes at this warehouse and tools as well; is that correct?

A. I did not pick up tools there. I picked up the boxes and the pipe that we needed to put in.

Q. You testified earlier that you can speak a little English; is that correct?

A. Yes, very little.

Q. Is the amount of English you speak today the same amount that you could speak prior to the May 18th, 2024, accident?

A. Well, now I know a little -- now I know a little bit more, a little more.

Q. And at the time of the May 18th, 2024, accident, did you -- were you conversational English at all?

A. No, no.

Q. Did you communicate with any English-speaking individuals on the job site prior to the May 18th, 2024, accident?

A. I would do it entirely through the phone through

Page 145

a translator.

Q. And you testified earlier, correct, that you did speak to some homeowners when you were going to work in front of their homes or in their yards?

A. Yes. Yes, very few times. I would show them on their phone, on the phone, and I would use a translator.

Q. I think you testified earlier that there had been a broken sprinkler a day or two before the accident on the project; is that correct?

A. Yes, sir.

Q. Who informed you of the broken sprinkler?

A. The Romanians.

Q. The broken sprinkler, was that in a homeowner's yard?

A. Yes, sir.

Q. Did you ever communicate with that homeowner?

THE INTERPRETER: Okay, one momento.

THE WITNESS: I didn't get to communicate regarding that broken sprinkler, but it is very common to have broken sprinklers in this type of work. During the first week, we broke one sprinkler and I myself went to repair it. I knocked on the door and I asked them to turn on the sprinkler so that I could see which one was the one that was not working. I repaired it and everything was fine. It's normal for sprinklers to be

Page 146

broken.

BY MR. ESKUE:

Q. Did you repair the sprinkler that you had testified broke a day or two before the accident?

A. No, sir.

Q. Mr. Garcia Diaz, do you know who Ivath Haran Nunez is?

A. Yes.

Q. Who is Ivath Haran Nunez?

A. She's my girlfriend.

Q. How long has she been your girlfriend?

A. Five years.

Q. Was she residing in Rexburg at the same time you were?

A. Yes.

Q. Was she residing with you in Rexburg?

A. Yes.

Q. Does Ms. Haran Nunez have a cell phone?

A. Yes.

Q. Do you know her cell phone number?

A. No, sir. We are not in a relationship anymore. We broke up. I haven't talked with her for the last six or eight months.

Q. So the last time you spoke with Ms. Haran Nunez is approximately six to eight months ago?

Luis Garcia Diaz                                                02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

Page 147

A. Yes.

THE INTERPRETER: This is the interpreter speaking. The interpreter would like to ask the deponent to repeat his question [sic] as he was not clear.

THE WITNESS: I would send her letters to California.

THE REPORTER: I think he froze up again.

MR. HALL: You're on mute.

MR. ESKUE: Sorry about that guys. My computer is hardlined in, so I don't know what's going on with the internet. It just booted me off again, so I'm just going to do the rest of this from my phone because I don't have very much left.

Are we still on the record, then?

THE VIDEOGRAPHER: We are.

MR. ESKUE: Okay, when the last time I heard anything, it sounded like Mr. Garcia Diaz was continuing an answer. Can we just read the record back, if that's possible?

(The last answer was read back by the Notary Public.)

BY MR. ESKUE:

Q. Mr. Garcia Diaz, I apologize about getting cut off again here, so I'll just continue this line of questioning.

Page 148

Did you ever call Ms. Haran Nunez while you were in custody?

A. No, I would call my mom -- I would call my mom and my mom would communicate with her.

Q. What's your mom's phone number?

A. I don't remember. I don't have it here. I don't remember.

Q. But you were able to call your mother from custody; is that correct?

A. Yes, yes.

Q. So how did you call her if you don't recall her phone number?

A. Because I have notes in a paper with her name, her number.

Q. Are you able to make photocopies of your papers through the jail or through the prison?

A. I have never made photocopies. I don't know if it can be done or not.

Q. Do you know if guards or correctional officers have ever made photocopies for someone else in the prison?

A. I don't know.

Q. Would you be willing to inquire of the correctional officers to get a copy of the paper that your mother's phone number is on and have that provided

Page 149

to us through discovery in this case?

A. I can ask them.

MR. ESKUE: I appreciate that, Mr. Garcia Diaz. I think that's all the questions I have for you. I appreciate your time today.

THE WITNESS: Okay, yes, sir. Thank you very much. May God bless you.

MR. HALL: I just have a few follow-up questions. I will be quick.

FURTHER EXAMINATION

BY MR. HALL:

Q. Sir, you've repaired sprinklers a number of times before; correct?

A. Yes.

Q. Describe for me, how do you do that? How would you do that on the prior times you've repaired sprinklers?

THE INTERPRETER: The interpreter would like to clarify something with the witness, may I?

MR. HALL: Yes.

THE INTERPRETER: I believe the -- this is the interpreter speaking. I believe the witness is using a name in English that I am not identifying.

Page 150

May I have one brief moment, counsel, please?

MR. HALL: Yeah, and why don't I pull that question back and I'll just ask another question and see if he's able to do that.

BY MR. HALL:

Q. Would you use any tools to change sprinklers?

A. No, just a shovel.

Q. A shovel in your hands? That's it?

A. Yes.

Q. And for all the -- well, did you repair sprinklers in homeowners' yards while you were working on this project in Rexburg?

A. Yes.

Q. And you've never used --

A. We repaired two of them.

Q. And on those two sprinklers that you repaired, the only tools you ever used was a shovel; correct?

And you've never used a --

A. Yes.

Q. You've never used a compactor to repair a sprinkler; correct?

A. It depends. If the dirt is soggy, then you need the compactor, but you always have to have the -- but you always have to have the compactor in the truck just in case you need it.

Luis Garcia Diaz                                                02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

Page 151

Q. So you would always have the compactor in your truck; is that what your testimony is?

A. That truck didn't have a compactor, but the other two trucks had compactors, but each truck should have a compactor, because in each truck, there was a group of people.

Q. Now, you testified that you were in Rexburg working on the Rexburg project for three weeks; is that correct?

A. Yes, sir.

Q. And you also testified earlier that you stayed in two different Airbnb's while you were in Rexburg working on the Rexburg project; is that correct?

A. Yes, sir.

Q. How many nights were you in the first Airbnb?

A. Four.

Q. And then you moved to the second Airbnb; is that correct?

A. Yes.

Q. And approximately how many nights were you in the second Airbnb?

A. Two-and-a-half weeks.

Q. And you were -- you were living in and staying at the second Airbnb at the time of the accident on May 18, 2024; correct?

Page 152

A. Yes.

Q. Where does your former girlfriend, Ms. Nunez, live now?

A. I don't know where she lives, but she was living in California, but I don't know where she lives now. I think she returned to her home country.

Q. And you've been in your current location for the past year, correct, which is in custody at the county jail?

A. Yes, sir.

Q. And have you had visitors come visit you at the county jail in the last year?

A. I already told you that they don't allow visits here.

Q. Do they allow phone calls?

A. Yes.

Q. Is it your understanding that they record phone calls to you at the jail?

A. I don't know.

Q. Other than your lawyer in the criminal cases, anyone called you in the last year at the jail to talk to you about this case or the accident?

A. My attorney -- my attorney told me not to speak -- not to talk to anyone over the phone, so I don't talk to anyone over the phone. I don't talk to anyone --

Page 153

I don't talk to anyone over the phone regarding my case.

Q. Has anyone called you, though, other than your lawyer in the last year to ask you about this case?

A. The one that called me, I can't tell them anything because my attorney told me not to say anything over the phone.

Q. So somebody did call you?

A. My mom and my dad.

Q. Anybody --

A. But I can't tell them anything about this over the phone either.

Q. In the last year did anybody call you to ask you questions about the accident other than your mom and dad and your lawyer in the criminal case?

A. No one.

MR. HALL: No further questions. Thank you.

THE WITNESS: Thank you. May God bless you.

(Reporter inquiry.)

THE VIDEOGRAPHER: If there's nothing further, I will go ahead and take us off the video record. This concludes the videorecorded deposition of Luis Garcia Diaz. Off the record at 5:27 p.m.

(The deposition concluded at 5:27 p.m.)

(Signature waived.)

Page 154

REPORTER'S CERTIFICATE

I, CONSTANCE S. BUCY, CSR No. 187, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me.

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction.

That the foregoing is a true and correct record of all testimony given, to the best of my ability.

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 18th day of February, 2026.

Constance S. Bucy

_____
CONSTANCE S. BUCY, CSR No. 187
Notary Public

CONSTANCE S. BUCY
NOTARY PUBLIC - STATE OF IDAHO
COMMISSION NUMBER 12995
MY COMMISSION EXPIRES 9-5-2030

Commission expires September 5, 2030.

Luis Garcia Diaz
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

02/12/2026

**Exhibits**

**EXH 1 Diaz 0 21226**
70:17 78:24,25 80:10

**EXH 2 Diaz 0 21226**
70:18 82:1,15

**EXH 3 Diaz 0 21226**
70:19 82:16

**EXH 4 Diaz 0 21226**
70:20 83:18,19,20

**EXH 5 Diaz 0 21226**
70:22 85:21

**EXH 6 Diaz 0 21226**
70:24 89:7,8

**EXH 7 Diaz 0 21226**
71:4,6 91:13

**EXH 8 Diaz 0 21226**
93:11,12,14

**$**

**$3.00**
138:15,16,21,23

**(**

**(15)**
93:20

**(6)**
93:18

**(9)**
93:19

**0**

**0.0**
86:25

**0.08**
87:4

**02508**
115:1,21

**02509**
115:1,5

**078**
84:12,13

**08**
85:13

**1**

**1**
78:24,25 80:10

**10**
90:9 91:16

**10:31**
84:9,20

**112/59**
89:15

**11:45**
89:13,14

**12th**
72:6

**146**
95:20,23

**15**
93:5,7

**18**
74:24 76:6 77:7, 22 80:24 82:25 84:17 96:9 97:15,17 107:20 138:3 151:25

**18th**
95:14 97:22 118:12 128:10 131:10 138:5 144:15,19,23

**192**
84:5

**192.6**
86:25

**1:03**
72:7

**2**

**2**
82:1,15,17 91:17

**2024**
74:24 76:6 77:7 80:24 82:25 95:15 96:9 97:15,17,22 103:13,15,19 107:20 118:13

128:10 131:10 138:3 144:16, 19,23 151:25

**2025**
91:17

**2026**
72:6

**24**
99:11 100:2

**24-cv-479**
72:10

**26**
92:23

**28th**
97:18

**2:14**
94:17

**2:31**
94:19

**3**

**3**
82:16,17

**30**
87:1

**30-year**
114:18

**3:34**
117:19

**3:45**
117:21

**3:48**
119:7

**3:51**
119:9

**4**

**4**
83:19,20

**4:40**
132:7

**5**

**5**
85:21

**5:27**
153:22,23

**5:30**
76:6

**6**

**6**
89:7,8 93:4,6

**6:00**
77:21

**6:30**
84:1 86:7

**6:34**
84:3,17

**7**

**7**
91:12,13 92:12

**8**

**8**
93:11,12,14

**8:30**
138:9

**9**

**9**
93:4,7

**92**
89:16

**9:00**
138:9

**A**

**a.m.**
77:21 84:3,9,17, 20 86:7 89:13, 14

**Aaron**
73:4 94:7 117:6, 8 130:24 131:7, 13,16,22,24 132:8 143:5

**abdominal**
87:14

**ability**
97:8 142:18

**absolutely**
94:6 101:19 111:5

**accept**
86:21

**accident**
74:25 76:5 77:8, 13,17,18,19,21, 24 78:22 80:16 81:2 82:8,12 84:17,19,25 85:10 87:4,11 88:13 90:11 95:15 96:9 97:15,21,25 99:6,11 100:2,8 103:3,24 104:2, 6,9,16,17,19,21 105:7,12,15,20 106:2,4,5,14 107:14,19 108:1,11,25 109:8,21,24 110:2,7,16 112:15 113:6, 17,18 116:9,22 118:12 128:11 131:10 134:4 138:6,8 139:9, 14,16 140:16 141:2 144:16, 19,24 145:8 146:4 151:24 152:22 153:13

**account**
99:2,4,7 122:18 128:6

**accuracy**
113:25

**accurate**
82:24 88:14 90:16 92:20

**accurately**
97:8

**activity**
102:9

**actual**
112:7

**additional**
87:23

**address**
76:12 141:24 142:6

**Adrian**
75:2,7,15,25 139:3,6

**advantage**
138:10

**afternoon**
94:24 118:4,5

**agree**
82:3 86:16 96:8

**agreement**
138:24

**ahead**
73:3 80:17 110:19 117:9,12 121:24 132:20 136:7 153:20

**air**
101:20 125:20

**Airbnb**
102:16 123:9, 19,22 124:1 126:11,13,17,21 127:2,7 128:13 129:19 133:24 135:19 151:15, 17,21,24

**Airbnb's**
123:13 133:23 151:12

**Alcantar**
72:9

**alcohol**
74:19 84:12,13, 21,25 85:2,9,11, 12 86:8,17 87:24 88:19,20 89:21,24 90:8 91:4 130:4

**alcoholic**
107:18

**ambulance**
77:20 78:2,6,7, 11,12,17,18 80:13,18 81:2,3, 5 82:4 83:3,5,6, 8,10

**American**
98:24

**amount**
144:14,15

**and/or**
130:7,11

**Anival**
81:4 82:21,22

**answering**
90:7,13

**answers**
88:14,16 89:23 90:19 110:25

**anymore**
146:21

**apartment**
110:4

**apologize**
81:10 147:23

Luis Garcia Diaz                                                          02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

**appeals**
74:21,22

**approximately**
84:1,3,9 86:4
136:22 146:25
151:20

**area**
83:24 106:16

**areas**
143:16

**arise**
84:14

**arrested**
139:12

**arrival**
89:12,13

**arrive**
74:8

**arrived**
83:25 86:6
136:14

**arriving**
77:20

**arrow**
79:17

**asleep**
79:11 81:7 82:4
87:11

**assisting**
116:13

**assume**
86:21

**asylum**
140:14,15

**AT&T**
98:4

**attempt**
143:12

**attempting**
76:17

**attend**
132:1

**attending**
72:13 91:18
140:16

**attorney**
92:6,8 94:25
104:13 131:8
152:23 153:5

**attorneys**
72:13 96:21
97:1 141:13
143:2

**awkward**
132:17

**B**

**back**
74:24 81:3 83:4
94:12,19 111:22
117:21 119:9
126:16 128:10
129:18 131:16,
22,24 132:21
147:18,20 150:3

**bad**
88:4 90:4 113:2

**bank**
99:6 122:18

**bar**
107:22,25

**base**
137:8

**based**
89:17

**bed**
81:4 83:6
116:12

**begin**
95:2 117:15

**beginning**
85:8 141:1

**behalf**
73:4

**believes**
79:11

**belonged**
75:4

**birth**
74:6

**bit**
144:18

**bless**
143:2 149:7
153:17

**blood**
84:1,3,8,10,11,
13,16,20,21,24,
25 85:2,9,11,12
89:14

**blue**
136:10

**Bonneville**
74:14,15

**booked**
127:1

**booted**
147:11

**bordering**
111:1

**borrowed**
123:17,18

**boss**
95:14 96:8
100:15 120:9
121:8,10,11,15,
16

**boss's**
121:6

**bottom**
115:5,21

**Bowden**
135:4

**boxes**
141:23,24
143:20,23,24
144:1,3,6,7,10

**Brady**
73:3,7 94:7,9,24

**break**
94:5,10 110:23
111:7,13,15,19
112:6,7 117:15

**bring**
102:1 129:18

**broke**
134:11 145:21
146:4,22

**broken**
134:10,21
145:8,11,13,19,
20 146:1

**brought**
98:8

**Bruce**
72:18

**Bucy**
72:15

**bullets**
101:21

**business**
124:19,23

**C**

**cable**
133:25 136:17
137:5

**calculate**
136:25

**California**
147:6 152:5

**call**
96:22 99:15
135:6 148:1,3,8,
11 153:7,12

**called**
135:10,15
152:21 153:2,4

**calls**
99:12,16,21
100:3 152:15,18

**camera**
111:12,25 112:1

**caption**
72:8

**car**
74:25 100:2

**card**
98:19 99:4,9

**carry**
101:11 102:2,9

**case**
72:8,10,23
96:13,19
104:11,13
120:16 149:1
150:25 152:22
153:1,3,14

**cases**
152:20

**cash**
99:5 120:14
122:12 123:1,2,
8

**catch**
81:13 114:1
117:10

**caused**
129:14

**causing**
83:8,11

**cell**
97:17,19,22,24
98:3,6,10 99:12,
16,22 142:6
146:18,20

**center**
77:10 78:7 81:7
82:5 83:9,12
85:25 88:25
89:11,13,22
139:9

**chance**
142:3

**change**
80:5 91:16,18
119:1 150:6

**charge**
124:14

**charges**
85:6 91:6,8 92:9

**Charlie**
79:14

**check**
98:18 122:22
123:1,3,5,7

**chest**
87:14

**circumstances**
133:9 142:24

**city**
119:13 136:4,22

**claiming**
119:16 123:18,
22 125:3,22

**clarification**
77:4

**clarify**
77:2 101:18
104:1 106:8
125:15 141:19
149:21

**clear**
102:25 114:10
116:19,22
133:14 147:4

**client**
92:3 131:24

**closed**
111:6

**coerce**
92:14

**collected**
84:2,8

**collecting**
84:7

**collision**
77:12 84:6

**Colorado**
119:15

**Columbia**
74:7 99:14
140:15

**common**
145:19

**communicate**
130:21 144:22

145:16,18 148:4

**communicated**
75:6

**communicating**
116:9

**Communications**
73:8 95:1

**community**
84:1,16 85:20,
24 86:5,7 87:16
112:22

**compact**
77:5

**compactor**
77:5 103:23
104:3,4,7,9
105:12 106:13,
19,22,25 107:4,
6,8,12 108:9,10,
17,22 109:1,8,
11,16 128:16,
17,19,21 129:1,
4,7,9,12,15
134:14 150:20,
23,24 151:1,3,5

**compactors**
151:4

**company**
96:6 107:9
121:1 136:11
142:2,7,8

**complained**
113:3

**complains**
87:12

**complaint**
134:20

**complaints**
78:20 79:15

**completing**
115:10 116:14

**compressors**
138:20

**computer**
132:10,16,19
147:9

**concern**
110:23

**concluded**
153:23

**concludes**
153:21

Luis Garcia Diaz
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

02/12/2026

conduit
136:23

cones
113:1,6,9

conference
73:2

connection
76:20

Connie
72:15 73:21

conscious
90:24

consciousness
78:13 79:13

constant
110:24

construction
72:19 73:18
83:1 96:5

Content
84:13

continue
81:15 111:14
112:5 114:1,6
121:2 147:24

Continued
143:11

continuing
147:17

contractor
125:23

contractors
122:6,7

conversational
144:20

convicted
74:18

conviction
82:7 93:15

copy
148:24

correct
77:8 80:23 86:9
88:16,21 90:20
91:9 92:10 95:3,
6,15 96:5,9
97:15 100:13,
17,21,24 102:24
103:2,7,10,23
107:16,17
108:11 109:24
110:10,16
112:20 128:13,

23 135:19
142:11 143:21
144:2,8,12
145:2,9 148:9
149:15 150:17,
21 151:9,13,18,
25 152:8

correction
105:3 108:14
114:14 118:22

correctional
148:19,24

correctly
89:17 93:9,23
123:21

counsel
73:3,7 105:18
111:3 115:24
119:4 121:24
122:2 124:21
131:18 150:1

Count
93:6,16,22

country
152:6

counts
74:18 91:3

county
74:14,16 152:8,
12

couple
89:22 95:2
100:6 101:3

court
72:11,15 74:22
86:18,19 87:5
92:14,17,24
93:1,3,9 132:2
140:16

Court's
93:15

cover
131:2

covered
131:1 138:20
143:17

coworkers
99:18

crash
81:1 83:3,8,11
85:12,13 92:3
116:6

crashed
81:6

credit
98:19 99:9

crew
137:5

crime
93:16

criminal
104:11,13
108:10 152:20
153:14

crossed
77:10 78:7
79:12 81:7 82:5

crossing
83:9,11

current
152:7

custody
93:18,19 148:2,
9 152:8

cut
88:2 90:1
147:23

---

**D**

dad
99:14 153:8,13

damaged
139:20,23,25
140:2

Danielson
72:25 110:22
111:16,18 112:9
117:8,10,14
118:3 119:3,6,
10 121:18 122:3
124:22 125:17,
21 127:21
130:23 133:12

dark
138:10

data
92:2

date
72:6 74:25 77:7

David
74:5

day
97:21,25 99:6,
15 101:2,12
103:3 104:20,23
105:12 106:14
107:14,19
110:6,10,16
112:15 113:5,9
128:10 134:21
138:5,7 141:17

145:8 146:4

days
77:25 86:1
87:18,19 90:10
112:23 113:20,
21 134:21
137:20 140:8
141:4

deal
91:7 111:19

deals
121:1,4

debit
98:19 99:9

Defendant
73:7,17 92:16,
19

Defendants
94:25

deliver
144:4

demonstrated
85:12

denied
87:16

denies
87:13

department
84:2

depending
117:3

depends
150:22

Depoidaho
72:5

deponent
127:18 130:23
135:12 141:20
147:3

deposit
127:9

deposition
72:1,7,20,23
73:5 96:12,15,
18 120:15,18,23
121:5 122:13,
21,25 123:5
126:20 133:6
134:3 135:18
142:9,16
153:21,23

describe
134:23 149:17

descriptions
104:16

detention
139:9

determinate
93:17

determined
92:4,8

diagnoses
88:21

diagnosis
86:8,16 88:19,
20

Diaz
72:9,12 73:16
74:5 131:7
132:3 146:6
147:17,23 149:3
153:22

died
113:18

diesel
138:20

difficult
104:22,25

dig
136:5,12

digging
137:18

directly
121:10 130:21

dirt
77:5 101:21
102:2 150:22

disciplined
130:7,11

discounted
126:18,24
135:22 139:19,
22

discoveries
113:12

discovery
82:6 83:13
95:20 104:6,10,
15 108:10
116:17 128:17
140:21 141:11,
14 149:1

disposition
105:1

dispute
87:2

distracting
111:1,23

distribute
132:7

District
72:11

doctor
87:16,19,20
89:4

doctors
90:13 140:25

document
79:2,4 95:22
115:4,15,23

documentation
86:24

documents
140:18,20,24,25

Dodge
75:5 103:1
136:1

door
137:18 145:22

doors
137:20,23

dormitory
104:23

Douglas
99:1

drank
130:9,10,13,15,
18

draw
84:20,24

drawing
84:16

drawn
85:10

drill
101:15

drilling
119:19 120:19,
24 125:18 126:2
127:15 130:7,11

drills
101:16

drink
88:7 89:24
130:4

drinking
88:2,5 90:2,5
130:8

drinks
107:18

Luis Garcia Diaz
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

02/12/2026

**drive**
76:2 103:4
**driven**
108:7 109:18
**driver**
78:6,12 83:6
87:10
**driver's**
95:19,22 96:1
114:25 115:11
**driving**
75:2,5,24 76:6,8
79:10 100:7
**drove**
81:5 83:2
100:12 103:1
106:10
**drugs**
84:4
**duly**
73:12,18
**dump**
102:3,4
**dumpster**
102:1

**E**

**earlier**
100:7,11 103:22
112:19 126:20
128:11 144:11
145:2,7 151:11
**early**
76:8,18 80:25
83:1 129:15
**Eastern**
85:24 88:24
89:11,12,21
**easy**
104:24 114:16,
17,18
**effort**
114:19
**emergency**
84:2 86:24
87:16
**employed**
125:3,6
**employee**
83:4 120:19
**employer**
118:15
**end**
81:15 126:18

**ended**
104:20 126:24
137:2
**English**
73:13 79:5,8
80:1 81:20
83:22 86:3,24
87:8,25 91:23,
25 92:13 116:25
144:12,14,20
149:25
**English-speaking**
144:22
**Enrique**
72:22 132:12
133:4
**enter**
142:5
**entered**
91:7 138:24
140:14
**equipment**
101:25 127:10,
15,25 128:1
141:17
**Eskue**
73:4 117:9,12,
16 130:25 131:6
132:10,16,20
143:11 146:2
147:9,16,22
149:3
**et al**
72:9
**ethanol**
84:5 86:25
**ethyl**
84:12
**Evans**
73:11 114:7
**evidence**
104:16
**evil**
143:3
**EXAMINATION**
74:1 94:21
118:1 131:4
133:1 143:9
149:11
**examined**
73:19
**exceed**
93:20

**exchange**
125:25
**excuse**
104:22 124:20
**exhibit**
78:24,25 80:10
82:1,15,16,17
83:18,20 85:21
89:7,8 91:13
93:11,12,14
**exhibits**
91:11,12
**expenses**
125:9 138:19,21
**Expert**
73:8 95:1
**explain**
139:21
**eye**
88:9

**F**

**fallen**
82:4
**Falls**
76:11 80:12
83:25 84:15
85:20,23 86:5,7,
24 87:15 106:1,
6,14,23 107:1,9,
12,15,19,23
108:1,5,9,16,22,
25 109:7,12,15
128:16
**false**
90:16
**family**
99:14 100:4
**February**
72:6
**feet**
99:19 137:2
**fell**
79:11 81:7
87:11 106:19
**felonies**
87:6
**felt**
88:1,4 90:1,4
**fiber**
118:9 122:10
136:13,17,23
137:19 141:16

**fifteen**
93:20
**figures**
87:2 89:17
**file**
141:11
**filed**
72:10
**filling**
88:15 90:12
115:13
**find**
119:22
**fine**
77:3 145:25
**finish**
138:7 144:4
**finished**
144:4
**firefighters**
116:7,21
**five-minute**
117:14
**fix**
134:6
**fixed**
93:4,6,17
**floor**
131:22 132:15
**flying**
106:19
**follow-up**
117:3 149:8
**foot**
125:8 136:24,25
138:15,23
**Forensic**
84:10
**form**
89:12,18 115:11
116:14 134:7,
15,25 135:20
137:6 142:12
**forms**
90:12 116:16
**found**
85:5 86:18
**foundation**
134:15
**Fourth**
88:7
**fracture**
77:16

**free**
126:25
**freely**
92:17
**Friday**
134:4
**friend**
75:16 98:20,22,
23 99:3
**friends**
99:13 100:4
135:15
**front**
145:4
**froze**
147:7
**frozen**
131:13
**full**
104:10,15 112:4

**G**

**Gallegos**
81:4 82:21,22
**Garcia**
72:9,12 73:16
74:5 131:7
132:3 146:6
147:17,23 149:3
153:21
**Garcia-diaz**
81:4,6 83:5,7,25
84:8,9 133:4
**Garcia-diaz's**
84:3
**gas**
125:10 136:9
**gasoline**
138:19
**gave**
75:9,19,22 99:1
121:3 126:15,25
128:4,5 134:24
135:22,25
136:16 140:15
**Giovanni**
80:21,22 83:4
**girlfriend**
146:10,11 152:2
**give**
99:5 102:6
111:6 113:23
114:4 118:24
122:19 125:4

128:3
**giving**
123:5
**God**
143:2 149:7
153:17
**Gold**
73:8 95:1,20,23
**good**
94:4,11,24
104:25 106:16
114:8 116:23
118:4,5 122:1
**GPS**
142:7
**great**
94:15 117:16
**ground**
101:22 104:7,9
106:19,20
136:12
**group**
151:6
**guards**
148:19
**guess**
111:18
**guide**
124:6,7
**guiding**
112:4
**guilty**
85:5 86:18,19,
20 87:6 88:5,
90:4 91:5,7
92:9,17
**guys**
112:4 147:9

**H**

**Hall**
73:3,7 94:9,15,
23,24 100:1
101:19,23
105:5,19 106:9,
12 108:19,23
109:6 110:14,18
111:3,8,11,15,
20 112:7,10,11
113:4 114:7,9,
21 116:1,4,8,24
117:2,17 131:23
134:7,15,25
135:20 137:6
147:8 149:8,13,

Luis Garcia Diaz
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

02/12/2026

22 150:2,5
153:16

**hamstring**
78:19 79:15

**hands**
150:8

**handwriting**
115:14,16,17

**hangover**
88:9

**happened**
81:1 116:6
118:12 139:14
140:17

**happy**
94:10

**Haran**
146:6,9,18,24
148:1

**hard**
113:19

**hardlined**
147:10

**haul**
101:14,24

**hauling**
101:25

**head**
87:13,16 110:24
111:22 112:3

**headed**
109:24,25

**hear**
123:21 133:17
141:19

**heard**
144:6 147:16

**Hearing**
91:16,17,19

**hearings**
91:23

**heavy**
102:10

**held**
72:7

**helped**
116:7,12

**highlighted**
83:24 91:25
115:20,23

**hip**
77:16 87:12,21

**hire**
127:23

**hired**
96:4

**history**
79:9 87:7

**hit**
81:8 82:5,12
83:7

**hold**
102:11 144:1

**home**
109:22,24
129:8,9,18
152:6

**homeowner**
133:15 134:5
145:16

**homeowner's**
134:6 136:3
137:18 145:13

**homeowners**
130:21 133:21
145:3

**homeowners'**
150:11

**homes**
145:4

**Honduras**
140:10

**honest**
111:20

**honestly**
142:10

**Honor**
92:16,19

**horse**
79:14

**hospital**
77:24 78:4,5,16
81:2 82:10,13
83:16,17 84:1,
16 85:20,24
86:5,7 87:16
89:2 97:11,15
139:9

**hour**
84:16,25 112:25
113:1

**hours**
84:1,9,19 85:10,
11 87:3 99:11
100:2

**house**
105:14,22,24
107:1 108:12
109:4 110:4,5
113:10 127:4

137:1

**housed**
76:13

**houses**
133:23 136:22

**HPI**
79:9

**I**

**Idaho**
72:11 74:21,22
76:11 80:12
83:25 84:10,15
85:20,23,24
86:5,7,23 87:15
88:24 89:11,12,
21 106:1,6,14,
22 107:1,9,12,
15,19,23 108:1,
4,9,16,22,25
109:7,11,15
114:24 115:11
123:14 128:16

**idea**
75:17 98:7,9
136:21

**identical**
93:15

**identification**
78:25 82:18
83:20 85:21
89:8 91:13
93:12

**identified**
75:14 79:9

**identify**
72:14

**identifying**
149:25

**II**
93:6,22

**illegal**
95:9

**illegally**
123:2

**Illness**
87:8

**imagine**
115:12 129:16,
23

**immeasurabl**
**e**
92:25

**immigration**
140:11,13

**impair**
97:7

**inadvertently**
121:25

**incoming**
89:11,18

**Incorporated**
95:1

**independent**
125:23

**independentl**
**y**
119:13

**indeterminat**
**e**
93:5,7,19

**individual**
80:18 82:3
95:21,25 96:1

**individuals**
144:23

**influence**
74:19

**information**
116:10

**informed**
145:11

**injury**
78:20 79:10,16

**inquire**
148:23

**inquiry**
99:24 153:18

**install**
136:13,17,23
137:5

**installing**
133:25 141:16

**instance**
73:17

**intent**
129:18

**intention**
112:14

**interact**
133:14

**internet**
120:4 126:6
143:13 147:11

**interpret**
81:11

**interpreter**
72:16 73:12
75:10 76:19,23
77:1,4 79:19,23
80:3,4,9 81:9,
10,19,23 82:1
85:15,16 86:10,
11 90:21 92:4
94:16 101:17
105:2,17 106:7
108:13 112:21
113:14,22
114:8,12,14
115:24,25
116:2,15 118:22
119:1 121:13,23
122:1 124:20,21
125:14,15
127:17,18 132:3
133:17 135:11,
12 141:18,19
145:17 147:2,3
149:20,23,24

**interrupting**
114:2

**intervention**
90:8

**intoxicated**
91:8 130:2,12,
16,18

**intoxication**
86:8,17 88:19,
20

**investigation**
84:6 92:2

**involuntary**
85:6

**involved**
74:25

**issues**
140:15

**Ivath**
146:6,9

**J**

**J&a**
96:4 120:19,24
127:15 130:7,11

**jail**
74:14,16 95:12
97:18 98:8
104:12 148:16
152:9,12,18,21

**Jaime**
95:15,16 96:2,3,
4,8 97:10,14

98:10,15 99:22
100:15 102:11
103:13 109:7
118:17,20
119:16,19
120:1,6 121:6,8,
11,14,19,21
122:5,14,17,18,
22 123:5 124:17
125:12,13,18
127:14,19,22,
23,24 128:1,2,3
130:8,12 139:11

**Jaime's**
120:9 125:11,22

**Javier**
121:21,22,24

**job**
99:20 118:23
120:2 124:5,11,
13 125:9 130:5,
8,12 144:4,23

**jobs**
103:12

**join**
111:4

**judgment**
93:15,23

**June**
91:16,19

**K**

**key**
75:23 134:24
136:1

**keys**
75:9,19 102:6,
11,13

**kicked**
132:11

**kind**
99:20

**knew**
96:2,3 100:18
109:9 118:21,23
121:8,9 124:5,9,
10

**knocked**
137:17 145:22

**Korneychuk**
72:5

Luis Garcia Diaz
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

02/12/2026

**L**

**Larrea**
84:7
**Latin**
140:7
**law**
93:8
**lawsuit**
97:2
**lawyer**
143:4 152:20
153:3,14
**lawyers**
140:19
**laying**
83:5 104:7
116:12
**leading**
111:2
**learned**
119:14
**leave**
102:19,21 116:2
**left**
78:19 79:14,15
87:12 91:11
105:13,22,24
108:12 109:4
112:24 113:2,10
119:14 128:13,
18,21 147:13
**leg**
78:19 79:14
87:21
**legal**
74:10 85:1
**lend**
138:25
**length**
92:3
**letters**
147:5
**level**
84:5,12,22,25
85:11,12 86:25
**license**
95:19,22 96:1
**Likewise**
143:1
**limit**
85:2,13 97:7
**lines**

77:10
**litigation**
87:5
**live**
152:3
**lived**
123:13,23
**lives**
152:4,5
**living**
110:1,4 151:23
152:4
**LLC**
73:18
**loan**
126:14 135:22
**located**
76:10
**location**
76:12 152:7
**locations**
109:14
**lodge**
111:17
**long**
74:15 75:24
81:12 114:5
118:13 132:5
141:9 146:11
**longer**
138:11
**looked**
104:18
**Lopez**
95:15 96:2
**losing**
78:13 79:13
**loss**
78:15 80:15
92:25
**lost**
93:1 143:13
**lot**
112:2,3,23
131:1 143:16
**lower**
87:4
**Luis**
72:9,12 73:16
74:5 80:17 81:4
83:5 94:8 118:4
133:9,12
134:17,23 135:7
136:20,22
137:24 138:8,12

139:16 140:3,11
141:15 142:2,9,
23 143:5,12
153:21
**lying**
95:11

**M**

**made**
121:4 122:24
123:4,7 127:1,4
148:17,20
**majority**
141:12
**make**
93:2 105:3
118:6 148:15
**manslaughte
r**
74:19 85:7 91:3,
8 92:9
**Manslaughte
r-vehicular**
93:17
**Manuel**
72:8
**map**
136:16,19 137:9
**maps**
118:25 121:3
124:5,10
137:11,14
**marked**
78:23,25 82:15,
17 83:18,20
85:21 89:7,8
91:13 93:12
95:23 114:25
115:4,21 136:8,
9,12,15
**materials**
138:20 141:25
**maximum**
93:8
**Mcallister**
72:18,19 73:21
74:3 77:3,6
79:1,20,22,24
80:3,8,11 81:9,
17,20 82:2,14,
19 83:21 85:18,
22 86:15 89:9
91:1,14 93:13,
25 94:4,11
100:6 142:12

**meal**
132:6
**meals**
132:7
**medical**
85:19,25 88:24
89:11,13,22
**medications**
97:7
**meeting**
139:3
**meetings**
96:23
**Meikle**
92:1,6
**member**
84:15
**memory**
78:15 80:13,15
82:11 106:16
116:22 128:22
**mentioned**
143:19
**met**
119:24 126:6,9
**Mexicans**
140:10
**Mexico**
120:13
**mg/dl**
86:25
**Michael**
72:25 94:7
110:22 117:7
131:1
**middle**
79:9 132:12
**Millennium**
73:4 131:8,11
**mind**
90:19 132:18
**mine**
98:20 127:12
**minimum**
93:17
**minutes**
94:5,13
**missiles**
101:20 125:20
126:3
**misstate**
144:5
**misstates**
110:17 113:7

135:20
**mom**
99:13 148:3,4
153:8,13
**mom's**
148:5
**moment**
76:21,23 85:16
101:18 113:14
150:1
**momento**
112:21 113:14
114:12 116:15
121:13 145:17
**money**
99:2,3 122:19
123:16,17,18
126:16,19,24
127:6 140:5
**months**
146:23,25
**morning**
76:6,8,18 77:21
81:1 83:2 88:8,
12 108:25 109:8
129:15
**mornings**
103:17,18
**mother**
148:8
**mother's**
148:25
**Mountain**
73:1 136:11
**move**
80:5 101:10
111:21 112:2
**moved**
151:17
**movement**
112:3
**muffled**
133:13
**multi-vehicle**
87:11
**multiple**
111:21
**mute**
147:8

**N**

**names**
135:9,14,16
139:7

**natural**
112:3
**neck**
87:13
**needed**
102:8 109:9,10
118:21 129:16,
23,24 134:2
136:17 138:19
139:25 144:3,10
**negative**
84:4
**neighbors**
113:3
**nerves**
88:8
**Networks**
73:5 131:11
**night**
138:9
**nightclub**
107:22 108:1
**nights**
151:15,20
**nodding**
110:24 111:22
**normal**
86:25 89:14,16
145:25
**Nos**
82:17
**Notary**
147:20
**notes**
131:1 148:13
**number**
86:4 97:24
99:17 122:11
137:2,3 146:20
148:5,12,14,25
149:14
**Nunez**
146:7,9,18,24
148:1 152:2

**O**

**oath**
95:3,5,9,11
142:18
**obey**
122:20
**obeyed**
118:19

**object**
109:2 134:7,15, 25 135:20 137:6 142:12

**objection**
110:11,17 111:16 113:7

**objects**
131:17

**obtained**
84:20 91:15

**occasion**
102:19

**occupants**
83:10

**occurred**
103:24 104:2

**offer**
120:2

**office**
72:24 73:6,9

**officer**
116:13

**officers**
148:19,24

**oil**
138:20

**opener**
88:9

**operate**
124:19,23

**opinion**
111:1

**opposed**
85:24

**opposite**
78:8

**optic**
118:9 136:17,23 137:19 141:16

**option**
92:5,10

**orders**
118:19 122:20

**original**
80:6 81:25

**orthopedic**
88:23

**outrageous**
111:5

**outweighs**
92:25

**owed**
140:1

**owned**
75:2,25 129:12 142:2

**owner**
75:20 127:6

**oxygen**
89:15

**P**

**p.m.**
72:7 153:22,23

**pages**
86:3 89:10

**paid**
96:10 98:20,22, 23 118:16,17 119:14 120:21 121:15,16,20 122:14,15,17,22 123:5,9 125:1,7, 18,19 126:11, 13,15,16,17,21, 23 127:6 135:19 138:15,18 139:25

**pain**
78:18 79:14 87:12,13,14,17

**paint**
136:9,10 137:7

**paper**
148:13,24

**papers**
85:3 137:20,23 138:1 140:12,13 141:12,13 148:15

**paragraph**
79:21 80:7

**paramedics**
78:18

**part**
82:6 106:13 125:19 126:2

**parties**
72:14 97:2

**party**
131:25

**Pasha**
72:5

**pass**
94:1 111:10 117:2 130:23 142:25

**passed**
77:15,16

**passenger**
80:24 82:25

**past**
152:8

**patient**
79:10,12,15 87:10,12 89:11, 18

**pause**
76:25 81:13 113:24 114:3,5 119:8

**pay**
96:10 98:12,18 120:14 122:12 123:7,16 125:8, 9,12,13 126:16 127:24 135:21 137:1 138:13, 14,16,22 139:1, 15,24 140:1,8

**paying**
86:22 120:11 121:17 126:24 140:6

**payment**
123:8 128:4,5 135:23 139:17 140:10

**Pedro**
72:8

**pending**
74:21

**people**
82:10 96:10,11 101:11 113:18 118:16,22 124:12 127:13, 20 128:3,4 138:14,17 140:6 151:6

**percent**
84:13 89:16

**percentage**
125:1,7,8,12,13, 25 138:12

**perforate**
101:21

**performed**
89:5

**period**
93:18,19 129:25

**permission**
134:2

**permits**
137:21

**person**
75:19 120:13 126:6 137:17

**person's**
106:25

**personal**
98:11,18 100:21,23,24 101:1,6,8,12

**phone**
97:17,19,22,25 98:3,6,9,10,11, 12,15,18 99:12, 17,21,22 100:3 132:17 142:6 144:25 145:6 146:18,20 147:12 148:5, 12,25 152:15, 17,24,25 153:1, 6,11

**photocopies**
148:15,17,20

**photograph**
96:1

**photographs**
104:8,14,19 105:6 128:17

**physically**
127:6,8 133:14 134:23

**pick**
76:9,17 103:23 104:3 105:11 106:13 108:9, 12,16,21 109:1, 7,15 112:24 113:1,10 116:5 128:18,21 129:11,24 134:13 141:17, 23,25 143:20 144:7,9

**picked**
104:2,5 106:17 107:2,8,13,15 113:6,9,11 144:9

**picking**
106:22 107:11 116:20

**pickup**
79:11

**picture**
107:3

**pictured**
95:25

**pictures**
104:6,16,23 106:18 107:5 108:11

**pipe**
137:8 143:25 144:10

**place**
74:6 106:4,15 132:6 137:21

**places**
133:24

**Plaintiffs**
72:23

**plan**
79:25 98:21,22, 23

**plans**
110:6,16 112:14 127:1

**plastic**
143:24

**plea**
91:7,16,18 92:9, 15

**plead**
91:7

**pleading**
92:17

**pled**
86:18,20 87:6

**point**
79:17 89:12,19 111:2

**police**
84:10 98:7 114:25 115:11 116:13 140:23 141:4,6

**policeman**
116:11

**political**
140:14

**Ponce**
81:4 82:21,22

**pop**
132:21

**portion**
80:9 83:23,24 87:8 91:25 115:22

**portions**
91:22

**power**
136:10

**Pozos**
80:21,22 83:4

**precisely**
93:22

**prefer**
81:22

**preference**
117:8

**presence**
84:12

**present**
74:13 79:10 87:8 131:25 143:2

**pressure**
89:15 92:14

**prevent**
113:25

**previous**
141:13

**previously**
83:14 96:12

**prior**
99:11 100:2 105:20 106:1,5 107:14 108:1 118:12 119:11, 17,19 122:13, 21,25 123:4 131:9,10 137:20 144:15,23 149:18

**prison**
148:16,21

**problem**
87:24 138:2

**proceed**
72:17 131:25

**proceeded**
72:1

**proceedings**
76:25 119:8

**process**
82:7

**produced**
73:17 95:20

**project**
118:8,9,13 119:12,17,20,23 120:3,7,12,20, 24 121:12 122:5,10,14 126:5 127:11,

Luis Garcia Diaz                                                                          02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

16,25 128:2,8 130:1,5,8,20 137:12 138:13 145:9 150:12 151:8,13

**pronounces** 93:3

**prosecuted** 91:3

**protect** 143:2

**provide** 127:19,24 128:1 139:2

**provided** 96:18 98:2,10, 16 100:20 127:10,15 148:25

**provider** 98:2

**Public** 147:21

**publication** 120:4

**pull** 102:4 150:2

**punishable** 95:12

**purpose** 76:3 109:5

**purposes** 77:4

**put** 78:4 81:14 83:16 111:6,11 137:20,23 143:24 144:3,10

**Q**

**question** 80:19 86:13 88:1,4,7 89:20 92:13 97:21 105:18 112:12 122:2 124:21 133:10,12 141:9 142:13 147:4 150:3

**questioning** 132:13 147:25

**questionnaire** 87:24 88:12,14

**questions** 84:14 89:22 90:7,14,15,18, 25 93:25 94:7, 10 95:2 100:6 101:3 111:9 116:18 117:3,4, 6,7 118:7 131:16,21,22 132:15 140:19 141:1,5 142:10, 16,20,21 143:5 149:4,9 153:13, 16

**quick** 149:9

**quote** 79:10 80:4 92:1, 25

**R**

**Ram** 75:2,5,9,24 76:2 100:7,9,12,16 101:14,24 102:4,6,11,13, 16,19,23 103:1, 6,10 136:1

**range** 86:25

**rate** 89:15

**read** 79:8,21 80:1,17, 22 82:20,22,23 83:24 87:8,24 88:19 89:17,22 91:24 92:13,23 93:9,23 115:17, 22 124:5,10 147:18,20

**reading** 81:15

**reads** 80:22 82:21 86:24

**ready** 123:11 127:5 132:8

**reask** 97:21

**reason** 87:2 97:4 100:12,17 102:23 128:15 132:1,10 134:19

**reasons** 100:24 101:13

**recall** 78:12 79:13 84:15 90:7 96:12 98:2 101:14 106:25 107:6,8,11,18 108:24 110:6 114:11 115:10 116:9,13 148:11

**receive** 99:12,16,21 100:3 140:9

**received** 86:8 134:4 139:17 140:4

**Recess** 94:18 117:20

**recognize** 81:23 95:21 115:14

**recollection** 92:21 106:21 108:16 110:15 112:13

**recommendation** 93:4

**record** 72:4 74:4 80:13 94:16,19 114:25 117:18,21 119:5,7,9 131:19 147:14, 18 152:17 153:20,22

**records** 85:19

**red** 136:9

**refer** 100:8 118:8

**referring** 118:7,8 125:25

**refresh** 80:13

**Regional** 85:24 88:24 89:11,13,21

**relationship** 75:17,20 146:21

**remember** 75:11,12 76:12, 14,15,16 77:13, 17,19,20,23,24

78:3,9,14,15,17, 21 80:14,16 81:1 82:7,9,13 83:14,15 84:18, 19,23 85:23 86:1 87:18,19 88:15,23 89:1,4 90:10,12,13,17 91:2,6,18 95:16 96:6 97:24 98:5, 24,25 99:1 100:5 103:3,20 105:13,16,21, 22,23,24,25 106:17,18,24 107:2,3,10,13, 21,24 108:2,3 109:13,14 110:8 112:16,17 113:15,16,20 114:15,17 115:12,13 116:6,23 120:15,18,23,25 121:2,3,4,5,7,9, 24 122:13,21 126:8 128:12, 18,20,25 129:2, 3,5,6,10,12,13, 14,17,23 133:6 134:19,22 135:4,5,9,14,15 137:1,3 138:3,6, 8,14 139:3 140:20,22 141:3,5,7,8,16, 24,25 142:2,4,5, 7,8 148:6,7

**remote** 73:8

**remotely** 72:14,20,24 73:2,5

**rental** 107:9

**rentals** 125:10

**repair** 145:22 146:3 150:10,20

**repaired** 145:24 149:14, 18 150:15,16

**repeat** 76:22 86:12,14 90:22 105:18 122:2 124:21 127:18 135:13 147:4

**repeated** 90:9 130:13

**rephrase** 97:20 107:7

**reported** 84:13

**reportedly** 87:10

**reporter** 72:15 99:24 131:13 132:2 147:7 153:18

**reports** 87:11 141:10,11

**represent** 72:15,19,22 73:1 88:11 89:10 90:15 91:15 93:14

**represented** 75:7 96:25

**representing** 72:5 97:2 131:8, 24

**represents** 94:25

**requested** 84:7

**required** 95:6 102:9

**rescue** 116:21

**reservation** 127:3

**reserve** 117:3

**resided** 74:15

**residence** 74:13

**resident** 74:10

**residing** 146:13,16

**respect** 85:9

**response** 110:24

**responsibility** 86:21

**rest** 124:3 137:4 138:14,17

140:13 147:12

**restart** 132:16,19

**restarted** 132:21

**restaurant** 108:4

**restore** 93:1

**results** 84:4 87:4

**return** 131:19

**returned** 152:6

**reviewed** 92:1

**Rexburg** 106:11 110:3 112:23 118:9 119:11,22 120:3,5,7 122:10 126:5 130:1 133:15,22 136:4 137:3 146:13,16 150:12 151:7,8, 12,13

**rid** 88:9

**risk** 126:9

**road** 108:10

**roadway** 77:11

**role** 125:11

**Romania** 96:11 118:16 127:13,20 128:3,4

**Romanian** 134:24

**Romanians** 118:19 120:21 122:15,20 123:14,19,22 126:14 135:6,7, 18,25 136:18,19 137:4,15 138:23 139:8,15 145:12

**room** 72:21 73:2

Luis Garcia Diaz
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

02/12/2026

**S**

sake
113:24 131:15
sample
84:8,10,11
sand
143:25
saturation
89:15
Saturday
103:2,17,18
110:9 112:17,
20,25 113:1
129:15 134:5
138:3
Saturdays
103:4,10,16
110:13,21
112:17
savings
140:9
scene
77:21
screen
79:2 80:5,6
81:11,14 95:17
111:6,22 114:24
116:3 140:19
screening
87:24 89:21
90:8
search
76:23 84:7
seat
81:3
section
91:23,24 92:23
115:20
security
122:11
selected
91:22
send
99:3,5 147:5
sense
93:7
sentence
93:3,5,6,9,20
114:18
sentenced
85:5
sentencing
91:17,19 92:24

93:16
separately
98:15
September
91:17,19
Serna
72:22 94:2,6,14
108:18 109:2
110:11,17,24
111:5,9,11,13,
21 112:1 113:7
117:5 121:25
130:24 131:15,
20 132:2,8,14,
18 133:3,4,20
134:8,12,16
135:3,17,24
137:10 139:24
141:21 142:1,
15,23 143:4,18
service
80:13
services
84:11 98:3,12
serving
114:18
shape
116:23
shared
98:21
shock
141:2
short
94:10 110:23
shovel
150:7,8,17
show
78:23 79:17
81:21 82:14,15
83:18 86:2 89:7
93:11 104:13
130:1 136:16
137:7 145:5
showed
84:4,12 85:1
141:13
showing
85:19 89:19
shown
140:18
siblings
99:13
sic
147:4
sight
80:7 81:15

signature
115:5,8 153:25
Signet
72:19 73:18
80:25 82:5 83:1,
3 115:1,5,21
silently
112:4
Silva
80:21,22 83:4
Silver
131:8
similar
93:6
simply
79:25 118:24
single
128:4
sir
74:13,20 80:20
81:10 89:6
91:21 92:7,11
94:24 95:4,7,10,
13,17,21 96:17,
20,23 97:3,6,9,
16,23 98:1,5,14,
17 99:8,10,23
100:10,14,22,25
101:7 102:2,5,
18 103:25
107:17 108:6
112:12 113:8
114:10,23
115:2,7,9,14,20
116:25 118:11
119:21 128:14
130:6 131:12
133:8,11,19
137:16,25
139:10 140:8
142:4,14
143:15,22
145:10,15
146:5,21 149:6,
14 151:10,14
152:10
Sirbu
75:3,7,15,25
139:3,6
sit
106:21 108:15,
24 110:15
112:2,14 115:10
site
80:25 83:1
102:20 144:23
sitting
81:3 83:4

120:15
skinny
135:2
slightest
136:21
small
101:11
social
122:11
soggy
150:22
sounded
147:17
sounds
94:11
Spanish
73:13 79:6,18
80:2 81:18,21,
24 83:23 86:4,6
87:9 89:18
91:24 92:12
115:22
speak
116:25 131:10
134:1 144:11,
14,15 145:3
152:24
speaking
76:20 79:20
80:4 81:10
85:16 97:6
105:18 113:23
115:25 125:15
135:12 147:3
149:24
specific
112:13
specifically
109:1 140:22
141:6
spoke
87:20 97:10,14
146:24
spoken
80:14 92:3
96:19,21,24,25
spot
113:2
sprinkler
134:10,21
145:8,11,13,19,
21,23 146:3
150:21
sprinklers
145:20,25
149:14,19

150:6,11,16
staff
78:12,18 84:2,
15
stand
112:2
Star
131:8
starting
113:21 120:12
141:4
state
74:4 84:10
114:19,20,24
115:11 128:11
State's
93:4
stated
79:14 117:4
126:20 128:11
statement
80:1,12,18,21,
23 81:11,14
82:20,21,23
83:13 114:25
115:11 121:11
122:17,24
123:4,6 133:10
statements
82:6 92:20
states
72:11 74:8,11
79:13 123:2
stating
120:6,18,23
121:5 122:13,21
stay
85:23 86:5
123:19
stayed
123:22 151:11
staying
102:17 124:1
151:23
steady
88:8
stop
114:4
storage
107:12
street
76:15
stretcher
78:2

struck
78:8 79:12
subcontracto
rs
122:8,9
subject
104:24
summer
138:10
Sunday
103:2
Sundays
103:4,10,16
support
111:8
suppose
109:22 113:11
129:8 140:1
supposed
136:12 137:8
138:16
Supreme
74:22
surgery
87:20,21 88:24
89:3,5 90:11
SUSAN
73:11
sustainable
143:14
swear
72:16
swing
143:17
sworn
73:12,18

**T**

tablet
119:2
taking
72:20,23 73:1,5
talk
104:24 105:1,4
133:21 139:11
152:21,24,25
153:1
talked
75:6 78:10,14
82:8,9 83:14
139:14 146:22
talking
87:19 90:13

Luis Garcia Diaz                                                    02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

140:23

**tall**
135:1

**telling**
95:8 113:16
114:3 115:19
116:18 136:4

**temporary**
78:15

**ten**
94:5,13 124:2

**term**
77:2 125:15

**test**
89:21

**tested**
84:21

**testified**
73:19 100:11
103:22 108:8
112:19 144:11
145:2,7 146:4
151:7,11

**testify**
97:4,8 114:10

**testifying**
114:15

**testimony**
96:18 109:23
110:17 113:5,7
114:2 121:19
122:4,16
127:14,22
135:20 143:19
144:5 151:2

**testing**
84:3,11

**text**
134:4

**texts**
99:21

**therapeutic**
84:4

**thigh**
87:13

**thing**
88:8 105:15,21
115:18 116:18
136:24

**things**
101:11,13
102:10 113:19
116:23 121:15

**thinks**
114:3

**thought**
131:9

**three-week**
129:25

**time**
72:6 85:13
86:22 89:13,14
94:1,4 95:14
96:9,15,19
97:10,12,14
100:8 103:24
104:2,18 105:24
109:3,20,23
110:1 118:15
123:14,15
126:14 131:15,
21 132:3 135:19
138:7 142:24
144:19 146:13,
24 147:16 149:5
151:24

**times**
90:9 111:21
145:5 149:15,18

**today**
72:6 95:6 96:22
97:5,8 100:7,11
103:22 105:7
106:22 108:15,
24 110:15
112:14,19
115:10 121:19
122:4,16 127:22
133:9 140:19
142:17 144:14
149:5

**today's**
142:16

**told**
78:11,17 82:3
83:7,14 87:15
100:15,18
102:25 103:11
109:9,17
110:13,20
113:10 116:17
120:4,6 124:7,
12 126:4,12
127:4 128:7
134:3,20 137:21
138:1,22 140:3,
4 152:13,23
153:5

**tool**
90:8 128:1

**tools**
76:9,10,13,17
101:11 107:15
113:10,12

116:5,20
127:10,15,25
139:1,2 141:24
144:2,7,9 150:6,
17

**total**
91:12 93:20

**town**
106:13 109:17,
18,19

**traffic**
76:5

**trailer**
101:15,24
102:3,4

**trailers**
102:21

**transcript**
91:16 92:24
93:16

**translate**
73:12 80:7
81:16

**translated**
73:14 79:5 80:1
83:23 86:6 87:9

**translating**
80:9 82:1

**translation**
79:18,20 81:24
89:18 133:13

**translator**
145:1,6

**transported**
82:10,11

**traumatized**
104:21

**traveling**
77:11 80:25

**Trooper**
84:6

**truck**
75:2,5,9,25 76:2
81:5,7 82:4
83:2,6 100:7,8,
9,12,16,21,23
101:1,6,8,14,24
102:4,6,11,13,
16,19,23 103:1,
6,10 105:14
129:20 134:24
136:1 139:2,19,
23,25 140:2
150:24 151:2,3,
4,5

**trucks**
151:4

**true**
77:10 78:1,11
84:24 85:11,14
87:15 109:1
116:22 126:22
134:9

**truth**
73:19 95:6,9
96:16 97:6
114:20 116:21
142:10,20,22

**truthful**
142:17

**truthfully**
97:5,8

**turn**
86:23 87:7,23
88:18 111:12,24
112:1 145:23

**Two-and-a-half**
151:22

**type**
75:20 136:25
145:20

**U**

**unable**
132:1

**unconscious**
77:14

**understand**
95:3,5,8,11
118:7,10

**understanding**
102:22 152:17

**understood**
103:9

**unified**
93:5,7,20

**unit**
107:12

**United**
72:10 74:8,11
123:2

**unreasonable**
111:25

**untrue**
121:12 122:17,
25 123:6

**Utah**
106:4 119:13,24
120:12 124:9,
13,15 126:4

**V**

**van**
80:25 81:6,8
82:5 83:1,2,7

**Vasquez**
95:15 96:2
139:11

**vehicle**
75:21 78:8
79:12

**vehicular**
74:19 85:7 91:3,
8 92:9

**Verizon**
98:4

**version**
81:21 83:22

**versus**
72:9

**video**
153:20

**videorecorded**
153:21

**visit**
152:11

**visiting**
143:18

**visitors**
152:11

**visits**
139:13 152:13

**voluntarily**
92:18

**W**

**wait**
131:19,23

**waiting**
108:19 132:14

**waived**
153:25

**wake**
77:18 129:14

**walking**
111:22

**wanted**
111:17

**warehouse**
141:17,23 142:3
143:18,20 144:7

**warning**
113:23 114:4

**warrant**
84:7

**water**
136:10

**week**
103:5,7 145:21

**weekends**
103:15

**weeks**
76:1 118:14
137:12 141:15
151:8,22

**weird**
135:16

**Western**
73:1 136:11

**whatnot**
143:13

**wheel**
87:12

**whichever**
81:22

**white**
135:1 137:7

**wishes**
114:6

**woke**
77:24 78:15
113:20

**word**
76:24 141:19

**work**
76:3 80:25 96:4
97:1 98:10
99:16,19
100:13,17,20
101:1,6,9,12
102:23 103:15,
18 108:13
109:10 110:10,
12,16,20
112:14,18,23
116:6,20
118:18,22,25
119:15,16,19
120:2,5,6,11
121:4 122:5,10,
14 124:16,17,25
125:4 126:5

Luis Garcia Diaz                                                    02/12/2026
PEDRO MANUEL ALCANTAR vs SIGNET CONSTRUCTION

127:20 129:21
130:2,9,10,14,
15,17,19 134:2
136:3,25 138:2,
7,11 139:15
141:23 143:20
144:1 145:3,20

**worked**
96:7 101:20
103:8 112:16,
20,25 113:1
118:13,23
119:13 120:21,
24 121:14 122:6
124:18 125:4,25
126:2,3 140:9
141:7,15

**worker**
75:14,15,16
123:23,24 124:3

**workers**
75:10 101:10
102:8,14 123:23
124:1,14,16,17
138:18

**working**
76:20 102:20
103:13 106:4
119:11,12,23
120:13 124:8
125:19 128:8
130:1 133:16
137:12 145:24
150:11 151:8,13

**Works**
94:15 117:17

**worries**
143:15

**writing**
116:12

**wrong**
77:11

**Y**

**yard**
133:15 134:6
136:3 137:19
145:14

**yards**
134:2 145:4
150:11

**year**
91:20 97:13
120:16 152:8,
12,21 153:3,12

**years**
74:9,17 93:4,5,
6,7,18,19,21
97:13 104:12
146:12

**yellow**
83:24 91:24
136:9

**Yesterday**
105:8,9

**yield**
131:21

**yielded**
84:25

**Z**

**Zoom**
72:7 96:22